**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, JEFFERSON COUNTY BRANCH, et al., Appellants,**

v.

**Honorable Raymond J. DONOVAN, Secretary, United States Department of Labor, in his official capacity, et al.**

No. 84–5721.

United States Court of Appeals, District of Columbia Circuit.

Argued May 29, 1985.

Decided July 9, 1985.

Thomas D. Goldberg, Washington, D.C., with whom Philip A. Lacovara and Ronald A. Stern, Washington, D.C., were on the brief, for appellants.

Richard A. Stanley, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before GINSBURG and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Appellants, fifteen migrant farmworkers and two organizations whose members include migrant farmworkers, challenge the validity of an amended Department of Labor (DOL or Department) regulation concerning the minimum piece rates employers seeking to hire foreign workers must guarantee all their employees. The regulation is intended to effectuate in part DOL's responsibility to ensure that the employment of foreign workers "will not adversely affect wages and working conditions of workers in the United States similarly employed." 8 C.F.R. § 214.2(h)(3)(i)(A) (1985).

The district court held that the amended regulation did not represent a change in agency policy, that DOL had adequately explained the revision, and that the agency action was not otherwise arbitrary or capricious. *NAACP, Jefferson County Branch v. Donovan*, Civ. No. 82–2315 (D.D.C. Aug. 15, 1984).

We reverse the judgment and remand the case to the district court with instructions to return the regulation to DOL. The piece rate regulation at issue complements provisions setting a minimum hourly wage employers must guarantee all their employees before hiring foreign workers. In the absence of piece rate regulation, employers paying workers by the box or bushel picked, for example, could meet an increase in the minimum hourly wage by requiring workers to pick more boxes or bushels each hour. The stated policy of the piece rate regulation is to "avoid requiring [piece rate] workers to increase productivity to earn" the minimum hourly wage. 48 Fed. Reg. 40,168, 40,173 (1983). Despite this stated policy, however, the amended regulation *allows* an increase in productivity to substitute for an otherwise mandatory increase in the piece rate corresponding to an increase in the minimum hourly wage. The amended regulation thus appears to open to employers an enhanced incentive constantly to drive up worker productivity.

The DOL statement accompanying the amended regulation did not deal with the anomaly that the new provision would allow the employer practice (requiring piece rate workers to increase productivity to earn the minimum hourly wage) that it is DOL's stated policy to prevent. The Department accordingly passed over, without discussion, the additional incentive that the amended regulation appears to give employers to increase worker productivity. Until DOL demonstrates by reasoned explanation that it has considered these extremely relevant aspects of the amended provision, the alterations in the piece rate regulation cannot stand.

## I. BACKGROUND

### A. *Statutory and Regulatory Framework*

The Immigration and Nationality Act, 8 U.S.C. §§ 1101–1525 (1982 & Supp. I 1983) (as amended), permits entry of nonimmigrant aliens "temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country." *Id.* § 1101(a)(15)(H)(ii) (1982). Immigration and Naturalization Service (INS) implementing regulations require that every visa issued under this provision contain a "certification from the Secretary of Labor ... stating that qualified persons in the United States are not available and that ... employment of the [nonimmigrant alien] will not adversely affect wages and working conditions of workers in the United States similarly employed." 8 C.F.R. § 214.-2(h)(3)(i)(A) (1985).

DOL has established a detailed regulatory framework "to secure information sufficient to make [the] factual determinations" required by INS. 20 C.F.R. § 655.0 (1984). The DOL provisions require employers desiring to use temporary alien agricultural workers to file an application eighty days before the estimated date the workers would be needed, and to take steps to recruit United States workers for the

first sixty days of this period. *Id.* § 655.-200(a). At the end of the sixty days the application will be granted if the Department finds, inter alia, that sufficient qualified United States workers are not available; that alien workers are being offered no higher wages or better working conditions than United States workers; and that wages offered to both alien and United States workers will not be less than the hourly "adverse effect rate" (AER) determined to be necessary to prevent depressing comparable United States wages. *Id.* §§ 655.200(a), .202(b)(9)(i). The AER, which is to be computed annually on a state-by-state basis, *id.* §§ 655.200(b), .207, thus sets the minimum wage to be paid by employers of alien harvest workers. If workers are paid by piece rates rather than hourly rates, the piece rate must be designed to produce "average hourly earnings" at least equal to the AER. *Id.* § 655.202(b)(9)(ii). A worker must be paid the AER even if his piece rate earnings fall below that minimum wage level. *Id.*

B. *Old Piece Rate Regulation;* NAACP I *and* NAACP II

In 1978, after receiving extensive comments and conducting hearings at six different locations, DOL amended its regulations relating to temporary employment of alien agricultural workers. Included was an amendment to the piece rate regulation:

> In any year in which the applicable adverse effect rate is increased, employers shall adjust their piece rates upward to avoid requiring a worker to increase his or her productivity over the previous year in order to earn an amount equal to what the worker would earn if the worker were paid at the adverse effect rate.

20 C.F.R. § 655.207(c) (1984). The Department statement accompanying the 1978 regulation noted the observation of worker representatives that in the past "when the adverse effect rate [went] up, employers, instead of raising the piece rate, often simply require[d] their workers to work faster." 43 Fed.Reg. 10,306, 10,309 (1978). The effect of the amendment, the Department said, was to "clarif[y] and adjust[ ]" the DOL's "past policy" by requiring that

"*in any year in which the adverse effect rate increases, employers must redesign their piece rates accordingly.*" *Id.* at 10,-310 (emphasis supplied).

In *NAACP, Jefferson County Branch v. Donovan,* 558 F.Supp. 218 (D.D.C.1982) (*NAACP I*), the present plaintiff-appellants challenged a 1981 Department interpretation of the 1978 piece rate regulation. The interpretation stated that an employer may fulfill his obligations by "adjust[ing] the previous season's piece rate upward to a point where the employer's average worker in that activity will make hourly earnings equal to the season's applicable wage rate." *Id.* at 222 (quoting General Administration Letter No. 46–81 (Sept. 11, 1981)).

Under the 1981 interpretation, if the employer increased worker productivity in one year, that increased productivity rate would be the basis for calculating the next year's minimum piece rate. In other words, by driving up the productivity rate used in the calculation, the employer could thereafter lower any increase in piece rates required to match an increase in the AER. "The employer would only be required to increase the piece rate if the increase in the productivity rate did not offset the rise in the AER." *Id.* The particular growers involved in *NAACP I* had raised the productivity rate used for calculating piece rates from eighty bushels to ninety bushels a day. The Department, which had rejected the identical productivity rate increases in 1979, accepted them in 1980 and 1981.

The district court declared DOL's 1981 interpretation of the piece rate regulation "directly contrary to the plain meaning of § 655.207(c)." *Id.* The court found that the interpretation allowed the "abuse which the regulations were specifically aimed at containing"—increasing productivity to meet increases in the AER. *Id.* at 223. "The terms of this regulation clearly mandate" that "[i]f the AER is increased, ... the piece rate be increased accordingly." *Id.* at 222. To correct DOL's misinterpretation, the district court ordered that minimum piece rates under § 655.207(c) be calculated based on a constant, rather than

increased, productivity rate, thus mandating increases in piece rates directly proportional to yearly increases in the AER.

The claim in *NAACP I* covered three West Virginia growers and the calculation of the West Virginia AER and corresponding minimum piece rates. The original plaintiffs filed an amended supplemental complaint on behalf of a nationwide class of migrant farmworkers who work in states affected by DOL's temporary labor certification program. In *NAACP, Jefferson County Branch v. Donovan,* 566 F.Supp. 1202, 1206 (D.D.C.1983) (*NAACP II*), the district court in essence extended its *NAACP I* holdings to the nationwide class.

DOL did *not* appeal the district court's decisions.

### C. *New Piece Rate Regulation*

In 1983, DOL proposed the amended regulation here under review; in this revision, 20 C.F.R. § 655.207(c) reads:

*Piece rate adjustments.* In any year in which the applicable adverse effect rate increases to the point where the employer's previous year's piece rate in a crop activity will not enable the average U.S. worker's hourly earnings to equal or exceed the new applicable adverse effect rate without requiring the average U.S. worker to increase productivity over the previous year, the employer shall increase the piece rate to a level at which the average U.S. worker would earn at least the adverse effect rate. If, at the employer's previous year's piece rate for that crop activity, the average U.S. worker's hourly earnings equalled or exceeded the adverse effect rate, no adjustment to that piece rate would be required. The Regional Administrator shall determine the average U.S. worker's hourly earnings by obtaining from employers in the area of intended employment information as to the piece rates, earnings, hours worked, and productivity of U.S. workers, in a manner to be determined by the Administrator.

48 Fed.Reg. at 40,175.

DOL's statement accompanying the final rule asserted: "The rule revises the regulation to reinstate and to reflect accurately the agency's original intent in promulgating it...." *Id.* at 40,168. The Department underscored that the amendment embodied the DOL interpretation urged upon but rejected by the court in *NAACP I.* The reason for the amendment, the Department explained, was that "the court's interpretation" of the 1978 regulation, by mandating that piece rates be based on a constant productivity rate, tied employers to 1977 productivity rates. As a result,

> [e]mployers who paid a higher than average piece rate in 1977, and whose workers received, at that time, earnings far above the adverse effect level, would have been bound to maintain their workers at levels of earnings above the [AER].

*Id.* at 40,172. At the same time, DOL reiterated that the policy embraced by the regulation was "to avoid requiring workers to increase productivity to earn, at minimum," the AER. *Id.* at 40,173.

Plaintiff-appellants had submitted comments on the amended regulation when it was proposed. The commenters remarked: "Despite the Department's asserted position that '[w]orkers should not be required to increase productivity to earn the applicable [AER],' 48 Fed.Reg. 33686, the fact is that the proposed rule ... would require just that." Plaintiffs' Exhibit B at 3, *NAACP, Jefferson County Branch v. Donovan,* Civ. No. 82–2315 (D.D.C. Aug. 15, 1984). Plaintiff-appellants explained that "[d]uring a growing season, growers have been permitted by the Department to fire workers who are unable to produce at the rate necessary to earn the [AER]." *Id.* Under the amended regulation, piece rates are to be designed so that the *average* worker achieves, through the number of boxes or bushels filled, the AER based on the previous year's average productivity; but if workers unable to produce at the pace required to measure up to the AER are fired, then the trend will be for last year's *minimum* productivity. The current year's average productivity, thus driven up, will necessarily exceed the prior

year's average productivity. This new higher average productivity will then become the standard for next year's minimum piece rate; in the next year, the new average productivity will become the minimum productivity workers must meet if they are to attain the AER and thereby retain their employment. The result, plaintiff-appellants argue, is: (1) employers have a legitimate mechanism to spark constant upward movement of average worker productivity; and (2) workers will have to increase productivity to earn an increased AER.

DOL responded laconically to the observation that the amended regulation allows employers to meet increases in the AER with increases in productivity:

> Worker-commenters question the use of average worker productivity, stating that U.S. workers may be terminated from the[ir] employment for failing to achieve this average. DOL has also considered these comments separately, and as balanced against the comments submitted by employer-commenters in previous rulemakings on piece rates, in which the employers state that the average worker concept causes piece rates to rise. DOL has determined that the piece rates must be adjusted as necessary to avoid requiring workers to increase productivity to earn, at minimum, the [AER]. Any other forces which might apply to increase productivity are outside the scope of this rulemaking.

48 Fed.Reg. at 40,173.

Immediately after publication of the amended piece rate regulation, plaintiff-appellants sought to enjoin the regulation as violative of the Administrative Procedure Act, 5 U.S.C. §§ 551–559 (1982), and of the district court's order in *NAACP II*. The district court granted an interlocutory injunction based on its belief that promulgation of the amended regulation violated the *NAACP II* orders. *NAACP, Jefferson County Branch v. Donovan*, Civ. No. 82–2315 (D.D.C. Sept. 8, 1983). On appeal, this court reversed. *NAACP, Jefferson County Branch v. Donovan*, 737 F.2d 67

(D.C.Cir.1984). The panel opinion explained that the orders in *NAACP I* and *NAACP II* were based on the holding that the 1981 DOL interpretation had violated the Department's own regulation. Those holdings did not prevent DOL, through normal rulemaking procedures, from *changing* its regulation. The district court's focus, therefore, should have been on the rulemaking that yielded the amended regulation, not on the prior adjudications regarding the regulation in its pre-amendment state. This court clarified: "The validity of the amended regulation turns on whether the agency adhered to the APA's procedural and substantive requirements and, in particular, on whether the agency supplied a reasoned basis for changing its regulation." *Id.* at 73. Without expressing any views on these issues, the appellate panel remanded the case to the district court for renewed consideration. *Id.*

On remand, charged with responsibility to determine whether the agency had furnished an adequately reasoned basis for the alteration, the district court swiftly upheld the amended regulation. *NAACP, Jefferson County Branch v. Donovan*, Civ. No. 82–2315 (D.D.C. Aug. 15, 1984). It is this decision we now review and reverse.

## II. ANALYSIS

### A. *Standard of Review*

This litigation was set off course by the participants' misapprehension of the significance of *NAACP I* and *NAACP II* to the present amendment of the piece rate regulation. Plaintiff-appellants earlier argued, and the district judge held, that under the *NAACP I* and *NAACP II* orders DOL could not amend its piece rate regulation without the district court's leave. *See NAACP, Jefferson County Branch v. Donovan*, Civ. No. 82–2315 (D.D.C. Sept. 8, 1983), *quoted in Donovan*, 737 F.2d at 71. As explained above, *see supra* p. 1182, this position was incorrect; on appeal, therefore, the district court's interlocutory injunction against the amendment was reversed and the case was remanded for dis-

trict court consideration of plaintiff-appellants' remaining contentions.

DOL, on the other hand, throughout the amendment process and before this court, has treated the *NAACP I* and *NAACP II* decisions as having no bearing at all on the amendment of the piece rate regulation. *See* 48 Fed.Reg. at 40,172–73; Brief for Appellees at 16–20. This position is also incorrect.

■ In *NAACP I* and *NAACP II*, after the parties had presented their conflicting positions, the district court interpreted the 1978 piece rate regulation. DOL chose not to appeal those decisions. As to the policy and purposes of the 1978 regulation, therefore, *NAACP I* and *NAACP II* are preclusive. DOL is bound by the district court's interpretation of the 1978 regulation and may not further rehearse that matter. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) (issue preclusion).[1] DOL can, through proper procedures, rewrite its piece rate regulation; but it cannot assert that the *old* piece rate regulation meant something other than what the district court interpreted it to mean.

■ The holdings of *NAACP I* and *NAACP II* bear significantly on a threshold determination in the present case: our standard of review. DOL argues that the new piece rate regulation should be reviewed under the more lenient standard appropriate for amendments entailing no change in policy. *See, e.g., Stereo Broadcasters, Inc. v. FCC,* 652 F.2d 1026, 1030–31 (D.C.Cir.1981). This DOL-pressed argument was accepted by the district court on remand. *NAACP, Jefferson County Branch v. Donovan,* Civ. No. 82–2315, slip op. at 4 (D.D.C. Aug. 15, 1984).

In order to assert that the 1983 amendment represents no change in policy, DOL must claim that the 1978 regulation meant all along just what the new regulation says. That is indeed what DOL claimed in the statement accompanying the new version of § 655.207(c). 48 Fed.Reg. at 40,168

("The [amendment] revises the regulation to reinstate and to reflect accurately the agency's original intent in promulgating it...."). However, in the same statement, DOL concedes that the new regulation embodies the 1981 administrative interpretation of the 1978 regulation. *Id.* at 40,172–73. *NAACP I* and *NAACP II* held that the 1981 administrative interpretation defied the policy and purposes of the 1978 regulation. *NAACP I,* 558 F.Supp. at 222; *NAACP II,* 566 F.Supp. at 1208. Bound by these two unappealed district court decisions, DOL cannot assert that a new regulation based on the 1981 administrative interpretation represents no change in policy from the 1978 regulation. The holdings of *NAACP I* and *NAACP II* instruct that a new piece rate regulation codifying the 1981 administrative interpretation represents, and must be evaluated by DOL as, a large departure from the policy of the 1978 regulation.

We emphasize again that *NAACP I* and *NAACP II* do not themselves prevent DOL from altering its piece rate regulation even in a way that would represent a dramatic shift in policy. Those decisions require only that the Department admit that the new regulation *is* a change of policy.

Recognizing the import of *NAACP I* and *NAACP II*, we review the amended regulation under the standard appropriate for changes in policy:

If Congress established a presumption from which judicial review should start, that presumption ... is ... *against* changes in current policy that are not justified by the rulemaking record....

... In reviewing [the agency's] explanation, we must "consider whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." ... Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem .... The review-

---

1. None of the exceptions to the rule of issue preclusion are applicable here. *See* RESTATEMENT

(SECOND) OF JUDGMENTS § 28 (1982).

ing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); *see International Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 812–13 (D.C.Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

We add that even if the question were before us now for its first airing, we would find that the new regulation represents a change in policy from the old piece rate regulation. As explained below, the new regulation allows the very result that it is alleged to prevent, and that the old regulation (as interpreted by the district court) did prevent. Such a change cannot reasonably be described as involving "only [a] subordinate question" and as a "continuation of regulatory policy." Brief for Appellees at 17–18.

B. *Effect of the New Regulation*

■ Plaintiff-appellants have alleged serious deficiencies in the enforceability of the new piece rate regulation. Brief for Appellants at 36–38 (characterizing employer payroll records, which would be used to ascertain average worker productivity, as "extremely unreliable"); *see Williams v. Tri-County Growers, Inc.*, 747 F.2d 121 (3d Cir.1984) (finding that Tri-County Growers, one of the West Virginia growers whose temporary foreign labor certification was challenged in *NAACP I*, had underreported the hours of its workers and thereby overreported worker productivity).[2] This court need not reach the enforcement deficiencies

plaintiff-appellants detect in the amended regulation; for even if the regulation operated on accurate information in exactly the manner described by DOL, the new formulation would ineluctably allow the very employer practice it is supposedly designed to prevent.

DOL insists that the policy of the new piece rate regulation is identical to the policy of the old piece rate regulation: "Workers should not be required to increase productivity to earn the applicable [AER]." 48 Fed.Reg. at 40,172–73. But, because the amended regulation bases minimum piece rates on the previous year's average productivity, employers will gain, through productivity increases in one year, a reduction in the piece rate elevation needed the following year to meet an increase in the AER.

To clarify the difference between the old and new regulations, a numerical example may be useful. In Year 1, the AER is $3.00/hr and the prevailing piece rate is 30 cents a box. Area A's workers average 10 boxes an hour; Area B's workers average 12 boxes an hour. In Year 2, the AER is increased to $3.60/hr. Under the old piece rate regulation, the piece rates in both areas would increase proportionally to 36 cents a box. Under the new piece rate regulation, Area A's piece rates must be increased to 36 cents a box (because average productivity (10 boxes/hr) multiplied by the piece rate must equal $3.60/hr). But in Area B, *no* piece rate increase is required (12 boxes/hr $\times$ $.30/box = $3.60/hr). Observe that in Year 1, workers in both Area A and Area B could earn the AER by picking 10 boxes an hour. In Year 2, however, Area B workers who previously could have earned the AER by picking 10 boxes an hour *must* now pick 12 boxes an hour to earn the AER. This is how a fully enforced new piece rate regulation, based

**2.** Plaintiff-appellants also objected to the failure of the new regulation to explain exactly how average worker productivity would be calculated. Brief for Appellants at 34–35. The day before oral argument, the Department submitted a supplemental memorandum explaining that an average worker productivity rate would

be calculated for each "crop activity in a state, or specific crop area within a state, if warranted." Appellees' Supplemental Memorandum to the Court (May 28, 1985). Our analysis assumes the calculation method described by DOL in its supplemental memorandum.

on accurate payroll information, would operate: the productivity that workers must achieve in order to earn the applicable AER can be required to increase.[3]

As plaintiff-appellants explained in their rulemaking comments, employers need not falsify records or otherwise violate the law in order to obtain the yearly increases in worker productivity needed to avoid (or lessen) yearly increases in piece rates to match the AER. Because growers are permitted by the Department to fire workers unable to produce rapidly enough to measure up to the AER, employers have a legitimate, constantly operative mechanism to increase worker productivity. *See supra* p. 8.

DOL's statement of reasons accompanying the new regulation does not acknowledge, much less discuss, the fact that the new regulation allows increased worker productivity to make up for increases in the AER. The Department did acknowledge plaintiff-appellants' observation that "workers may be terminated from the[ir] employment for failing to achieve" the AER, and did not deny the accuracy of the observation. The Department's only response to the observation, however, was that "[a]ny other forces which might apply to increase productivity are outside the scope of this rulemaking." 48 Fed.Reg. at 40,173. The Department apparently failed to grasp plaintiff-appellants' point—that the new piece rate regulation *rewards* employers who increase worker productivity with an offset against increases in the next year's piece rates. Therefore, the new regulation *itself* creates an additional incentive—an additional "force"—to increase worker productivity. This force cannot rationally be "outside the scope of th[e] rulemaking."

### CONCLUSION

Thus, reading the reasons presented by the Department, we cannot avoid this conclusion: DOL has "entirely failed to consider an important aspect of the problem" the original piece rate regulation was intended to address. *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. at 2867. Until the Department demonstrates by reasoned explanation that it has considered the reality that the new regulation allows increases in worker productivity to meet increases in the AER, the alterations in the piece rate regulation cannot stand. *See Maryland People's Counsel v. FERC*, 761 F.2d 780, 785–86 (D.C.Cir. 1985); *Sang Seup Shin v. INS*, 750 F.2d 122, 125 (D.C.Cir.1984).

We do not hold that no reasoned justification for the new piece rate regulation is possible. The Department may find, for example, that the as-yet unconsidered consequences of the new regulation are overborne by problems the old regulation engendered. But we are not now positioned to consider the reasonableness of any particular explanation DOL might proffer to salvage its current regulatory formulation. As a reviewing court, "we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. at 2867. Accordingly, we reverse the district court's judgment and remand the case to the district court with instructions to return the amended regulation to DOL so that the Department may proceed to reconsider the matter in a manner consistent with this opinion.

*It is so ordered.*

---

**3.** Counsel for DOL was presented with the identical numerical example at oral argument and was asked if there were any flaws in the example. Counsel did not indicate any way in which the example inaccurately illustrated the new regulation in operation.