NAACP, JEFFERSON COUNTY BRANCH, et al., Plaintiffs,

v.

Raymond J. DONOVAN, Secretary of Labor, et al., Defendants.

Civ. A. No. 82–2315.

United States District Court, District of Columbia.

June 28, 1983.

Philip A. Lacovara, Washington, D.C., Thomas D. Goldberg, and Geoffrey F. Arnow of Hughes, Hubbard & Reed, New York City, for plaintiffs.

Richard A. Stanley, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., were on brief and William H. DuRoss III, Associate Sol. for Employment and Training, and Harry L. Sheinfeld, Counsel for Litigation, U.S. Dept. of Labor, Washington, D.C., of counsel, for defendants.

RICHEY, District Judge.

## BACKGROUND

This case is before the Court on cross motions for summary judgment in what may be called Phase II of this litigation. In Phase I, the Court held that the Department of Labor ("DOL") had improperly interpreted its regulations to allow growers to consistently increase the productivity that was required of workers before the workers were eligible to earn wages higher than the Adverse Effect Rate ("AER"),[1] thereby effectively reducing the workers' wages. The Court held that the regulations required that the piece rate[2] paid to workers be tied to the AER so that when the AER increased, workers with a constant rate of productivity would increase their piece rate earnings at a rate proportional to the increase in the AER. The facts of Phase I and a complete explanation of the concepts involved are set forth in the Court's opinion. *NAACP v. Donovan* ("*NAACP I*"), 558 F.Supp. 218 (D.D.C. 1982).

At the same time as the filing of the original complaint in this action, a second suit was filed on behalf of migrant farmworkers in Maine, Vermont and Florida. *Bragg v. Donovan*, No. 82–2361 (D.D.C. filed August 20, 1982). That suit was brought to compel DOL to establish 1982 AERs for the named states. In the past, AERs had been calculated based upon quarterly data provided by the Department of Agriculture ("USDA"). However, USDA had discontinued its quarterly survey and DOL had taken no action to develop a new methodology for establishing AERs. *Bragg* resulted in the filing of a consent decree in which DOL agreed to develop methodology to set the 1982 AERs for Maine and Vermont and the 1982 and 1983 AERs for the Florida sugar cane season.

In response to the *NAACP I* and *Bragg* Orders, DOL published a proposed rule. The rule set forth DOL's intention to establish the required 1982 AERs according to a new methodology based upon the USDA surveys taken in the first two quarters of 1981. The DOL notice also set forth the 1982 AERs—calculated pursuant to the proposed methodology—for Florida, Maine and Vermont as required by *Bragg* and West Virginia as required by the final order in *NAACP I*. The published notice indicated that although the proposed methodology was consistently applied in Florida, Maine and Vermont, DOL rejected the figure yielded by the formula for West Virginia. Instead, stating that the 17.2% figure produced for West Virginia was disproportionate, DOL proposed to implement only a 10% increase in the 1982 AER with the remaining 7.2% to be applied in 1983.

After comment, DOL published its final rule on January 4, 1983 (the "January 4th rule"). The final rule was identical to the proposed rule in most respects. It set AERs for Vermont, Maine, Florida and West Virginia, effective "beginning in the 1982 harvest season,"[3] and set a 1983 AER for West Virginia which reflected the full 17.2% increase yielded by DOL methodology for 1982. 48 Fed.Reg. at 235. No 1982 AER was established for any state not specifically addressed in the Court's orders nor was any methodology for establishing future rates mentioned.

In this phase of the *NAACP* litigation, the original plaintiffs have been joined by thirteen other individual plaintiffs from nine new states and a farmworkers organization on behalf of a class composed of migrant farmworkers who are employed in all states in which DOL permits the use of nonimmigrant alien farmworkers.[4] Addi-

---

1. For an explanation of the AER *see NAACP v. Donovan* ("*NAACP I*"), 558 F.Supp. 218, 219–20 nn. 2 & 3 (D.D.C.1982). *See also* p. 1205 *infra*.

2. An explanation of the piece rate and its importance is set forth in *NAACP I*, at 219 n. 1.

3. Use of the word "beginning" was the only significant difference between the proposed and final rules. The significance of this change will be discussed *infra* at p. 1207, n. 8.

4. Under the Immigration and Naturalization Act, temporary foreign workers may be permitted to enter the United States if "unemployed

tionally, the United States has been joined as a defendant to ensure that full relief will be available to plaintiffs. Plaintiffs raise three issues. First, can DOL lawfully set the 1982 West Virginia AER at 10% when its methodology yields a higher figure? Second, does DOL have an obligation to promulgate AERs annually? And third, what additional action, if any, is needed to enforce the Court's order issued in Phase I of this case? The parties have stipulated to the relevant facts and therefore the Court may proceed to decide this case on summary judgment.

## DOL VIOLATED THE APA BY FAILING TO RAISE THE AER IN WEST VIRGINIA TO THE LEVEL ESTABLISHED AS PROPER BY ITS OWN METHODOLOGY.

■ Pursuant to Court order, DOL commenced a rulemaking procedure and developed a new methodology for establishing 1982 AERs for Maine, Vermont, Florida and West Virginia. This methodology was consistently applied to the three former states, but was rejected as applied to West Virginia because DOL felt that the 17.2% rate that it yielded might "creat[e] economic hardship on small businesses." 47 Fed. Reg. at 52199. Although at first blush this position does not appear to be unreasonable, it constitutes a substantial departure from DOL's past practice of uniformly applying its AER methodology and improperly relies upon considerations outside of DOL's statutory mandate. Because insufficient justification is provided for the agency's departure from its practice of uniform application of its AER methodology, DOL's action violates the Administrative Procedure Act ("APA"). 5 U.S.C. § 551 et seq.

Consistent application of AER methodology is important to the temporary labor certification scheme. The AER is the rate at which DOL requires growers to pay all of their farmworkers before the department will allow them to import alien labor. The purpose of requiring payment of the AER is to prevent importation of nonimmigrant laborers from having an adverse effect on the prevailing wage rate. The AER is set pursuant to methodology established by DOL. Because DOL applies what it considers to be the "best" methodology (i.e., the formula most likely to accurately determine the level at which adverse effect will occur), it follows that if the AER is not set at or higher than the rate produced by that formula, the prevailing wage rate will be depressed.

DOL has subscribed to this logic in the past and has uniformly adopted the rate produced by its methodology. In fact, DOL has uniformly applied its formula for nearly fifteen years even in the face of annual increases greater than the 17.2% at issue here. See, e.g., 44 Fed.Reg. 32235 (1979) (Colorado AER increased 20.7% between 1976 and 1977); Stipulation of Facts ¶ 16 (Virginia AER increased 18.7% between 1979 and 1980); Stipulation of Facts ¶ 17 (Maryland AER increased 17.6% between 1980 and 1981). Thus, serious question is raised by DOL's deviation here from its past practice of consistently applying its AER methodology.

■ Under the APA, an agency may not abandon a prior policy without providing a reasoned explanation for the change. See, e.g., Natural Resources Defense Council v. SEC, 606 F.2d 1031, 1049 n. 23 (D.C.Cir. 1979); Office of Communication of the United Church of Christ v. FCC, 590 F.2d 1062, 1068–69 (D.C.Cir.1978). See also Action on Smoking and Health v. CAB, 699 F.2d 1209, 1216 (D.C.Cir.1983). To explain its actions, DOL merely stated that the 17.2% increase at issue here was "disproportionate" and would cause "hardship" to growers, especially in light of the fact that, pursuant to Court order, growers would have to pay this rate retroactively. See

persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii). DOL administers the regulations that have been developed to arrive at this determination. 20 C.F.R. § 655.0

et seq. If DOL determines that no domestic labor is available, it may grant "temporary labor certification" to a grower, thus allowing him to import nonimmigrant alien farmworkers.

*NAACP I.* However, insufficient explanation was provided for these conclusory statements. Moreover, DOL failed to explain why a 17.2% increase was disproportionate here, when similar figures had been considered appropriate in the past. Thus, the Court holds that DOL's justifications clearly fall short of the reasoned explanation required by the APA to justify departure from the agency's previous consistent application of its own methodology.

Furthermore, the reasoning DOL does provide for its actions is faulty. First, DOL's justification for its departure from past practice relies on considerations that are antagonistic to those with which DOL has been entrusted. In administering the labor certification program, DOL is charged with protection of workers. *See Elton Orchards, Inc. v. Brennan,* 508 F.2d 493, 499 (1st Cir.1974); *NAACP, Western Region v. Brennan,* 360 F.Supp. 1006 (D.D.C.1973). *See also Alfred L. Snapp v. Puerto Rico,* —— U.S. ——, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). It is thus strange indeed for DOL to decrease the wage rate due to workers because of its concern for hardship to *growers.* Accordingly, the Court will give such a justification little weight.

In addition, DOL improperly relies on the Court's order requiring retroactive payment, as justification for its actions. The purpose of the Court's order was to guarantee that workers would be paid the full amount due to them calculated pursuant to a properly formulated AER. By relying on the Court's order to reduce the AER, DOL defeats the very purpose of the order. The Court will not countenance such a result.

In sum, the Court concludes that DOL has failed to provide the reasoned analysis necessary to justify significant changes in policy. Scant reasoning is provided and that which is provided is faulty. Accordingly, this policy change cannot survive. Rather, DOL must return to its custom of applying its AER methodology consistently. In this case, the 1982 AER for West Virginia must be set at the rate produced by DOL's own methodology—a rate 17.2% higher than the previous year.

## DOL IS REQUIRED TO PROMULGATE AERS ANNUALLY AND ITS ATTEMPTS TO AVOID THIS MANDATE ARE IN VIOLATION OF THE IMMIGRATION ACT.

DOL regulations clearly mandate the promulgation of AERs on a yearly basis. The regulations provide that "the adverse effect rate *for each year* shall be computed by adjusting the *prior year's* adverse effect rate . . . ." 20 C.F.R. § 655.207(b)(1) (emphasis added). This language leaves little room for confusion. Moreover, it appears that DOL never even questioned this obligation until 1982.

In 1982, however, DOL failed to promulgate AERs for any of the states covered by the AER regulations. *See* 20 C.F.R. § 655.-207(b)(2). For the four states involved in *Bragg* and *NAACP I*—West Virginia, Maine, Vermont and Florida (sugar cane only)—1982 AERs were finally promulgated pursuant to Court order. 1981 AERs are still in effect for all other states. In addition, DOL's January 4, 1983 rule purported to exempt West Virginia, Maine, Vermont and Florida (sugar cane only) from the requirement of 20 C.F.R. § 655.207 that AERs be promulgated yearly, so that the 1982 AERs established for those states could remain in effect indefinitely. Now, DOL contends that it has no obligation to promulgate AERs annually.

■ Defendants offer no legal support for the position that they have no obligation to promulgate annual AERs.[5] Instead, they claim that this issue is not ripe for judicial determination because they have not disavowed establishing AERs on a yearly basis. However, it is not necessary for defendants to publicly declare their intention to abandon all future calculations of AERs. The facts demonstrate that defendants are al-

5. It appears to the Court that DOL, by promulgating a rule to exempt four states from the requirement of promulgating yearly AERs, has effectively acknowledged that yearly promulgation is what the law requires.

ready remiss in their duties—they have failed to set 1982 AERs for all states but those in *Bragg* and *NAACP I*.[6] This is sufficient to provide a justiciable controversy.

■ Moreover, this controversy is capable of easy resolution. The Court holds that DOL must comply with its own regulations and establish AERs on a yearly basis for all applicable states. Moreover, the Court concludes that the January 4th rule, through which DOL attempts to exempt the *Bragg* and *NAACP I* states from the requirements of its regulations, must fail because it is contrary to the Immigration and Nationality Act ("INA"). 8 U.S.C. §§ 1101 *et seq.*

Pursuant to the INA and its regulations, DOL must assist the Attorney General in assuring that the importation of foreign laborers will not have an adverse effect on domestic workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1184(c); 8 C.F.R. § 214.2(h)(3)(i). The AER is promulgated to effectuate this mandate. By engaging in a yearly assessment of prevailing wages, and adjusting the AER accordingly, DOL is able to ensure that the prevailing wage rate is not depressed by importation of foreign workers.

■ In the past, DOL itself has stressed the importance of yearly reassessment of the AER, stating that such annual adjustments are necessary "to reflect changing labor market conditions . . . ." 41 Fed.Reg. 25018 (1976). The Court is convinced that yearly determination of the rate below which the wages of domestic workers will be effected is absolutely required in order for DOL to certify to the Attorney General that temporary laborers may be admitted without adverse effect.[7] Absent constant reassessment, domestic workers will be "protected" only by outdated AERs that do not reflect current economic realities. This is not the protection that the INA and its regulations envision. Accordingly, the January 4th rule through which DOL attempted to abrogate its duty to promulgate yearly AERs must fail to the extent that it conflicts with DOL's statutory duty.[8]

## THE PRIOR OPINION OF THIS COURT IN NAACP I DECLARES THE LAW AND IS THEREFORE APPLICABLE TO STATES OTHERS THAN THOSE SPECIFICALLY NAMED.

In *NAACP I,* the Court declared that DOL regulations required that piece rates

---

**6.** On April 7, 1983 defendants submitted a memorandum to apprise the Court of DOL's intentions in setting AERs. The memorandum stated that DOL was considering a 3-step process for establishing AERs that would be ready for application by 1985. Additionally, defendants stated that action was being taken to promulgate 1983 AERs for all affected states. However, on June 6, 1983, shortly before issuing this opinion, the Court requested an update on what progress, if any, DOL had made toward accomplishing its stated intentions. Defendants' response disclosed that nothing of substance had been done during this time. Moreover, DOL stated that action on 1983 AERs was being deferred pending issuance of this opinion. This lack of progress by DOL in carrying out its statutory mandate further underscores the importance of the Court's declaring DOL's obligation to establish annual AERs now. It makes clear that if the Court found that this controversy was not yet ripe, it would be but a short while before plaintiffs had to return to the Court seeking this same relief.

**7.** DOL has discretion to determine how to effectuate its mandated duties. Therefore, DOL

need not have established the "adverse effect rate" *per se.* Instead, some comparable rate could have been created. Once DOL chose the AER, however, it became bound to faithfully execute its duties through this vehicle unless and until a proper rulemaking was undertaken to develop a suitable alternative—which was not done here.

**8.** Even if the January 4th rule was free of the substantive deficiencies noted here, the Court would find it invalid based upon procedural infirmity. Under the APA, interested parties are guaranteed reasonable advance notice of and a fair opportunity to comment on new regulations. 5 U.S.C. § 553. While DOL did provide advance notice of the rule at issue here, the published proposal did not inform interested parties that DOL intended to leave the 1982 AERs it calculated in effect indefinitely. Only in the final rule did DOL indicate that the AERs established therein would be effective "*beginning* in 1982." A significant substantive change of this sort cannot be effectuated in such an offhanded manner—the notice and comment provisions of the APA must be followed.

be tied to the AER at a standard rate of productivity. The Court anticipated that, in order to comply with this ruling, DOL would communicate this directive to its Regional Administrators in charge of temporary labor certification. DOL, however, chose to inform the Administrators only that the Court's ruling should be applied in the states specifically covered by the Orders in *NAACP I* and *Bragg*. The Court finds that this action was not sufficient to comply with its Order.

■ In *NAACP I*, the Court determined that DOL had been applying its regulations improperly and issued a declaratory judgment interpreting these regulations. This declaration was in no way limited to the facts of the case or to the states directly concerned in that action. Moreover, the Court can conceive of no argument, and defendants offer none, that would justify DOL's continued application of an *incorrect* interpretation of its regulations to states other than Vermont, Maine, West Virginia and Florida.[9] Once the Court declared the proper interpretation of these regulations, DOL was bound to accept and comply with the Court's Order. To the extent that this was not clear from *NAACP I,* this opinion should remove all doubt as to the Court's intentions.

■ There is one other point in the Court's prior opinion that needs further clarification. The Court held that piece rates should be tied to the AER at a standard rate of productivity. However, the Court did not determine what this rate of productivity should be (except for the three growers specifically named in *NAACP I* ). The Court here determines that the most appropriate rate is that which was in effect in 1977—the year the AER regulations, 20 C.F.R. § 655.207, went into effect.

The productivity rate is the number of bushels a worker must pick so that, if he were being paid solely by the piece, his salary would be equivalent to the AER.[10] If a worker produces more than the productivity rate, he will earn an amount greater than the AER as determined by the number of additional bushels he picks. The productivity rate is not set by DOL. Rather, the productivity rate is implicitly established by the *piece* rate that growers propose to pay.[11] However, before temporary labor certification will be granted to a grower, DOL must approve the grower's proposed piece rate.

In *NAACP I* the Court found that, in violation of its own regulations, DOL had been allowing growers to increase productivity rates, rather than increasing piece rates, when the AER was increased. This practice had been allowed since the regulations were established in 1977, thus permitting growers to hold down the income of farmworkers even while the AER increased.[12] Because the Court found that

---

9. Significantly, substantial evidence was put before the Court demonstrating that the Court's interpretation of DOL's regulations is the same interpretation that had been applied by DOL in the past. This point seriously undercuts any argument by DOL that the Court's interpretation is not correct. Moreover, because DOL dismissed its appeal of the Court's prior decision, that judgment became final and binding.

10. All workers are guaranteed that they will receive wages at least equivalent to the AER. Therefore, the piece rate is only important to those workers who produce at higher than the required productivity level. Most workers fall into this category however.

11. The relationship between the three concepts involved here—piece rates, productivity rates

and the AER—can be expressed by the following equation:

$$\text{Piece rate} \times \text{productivity rate} = \text{AER; or}$$
$$\frac{\text{AER}}{\text{Piece rate}} = \text{productivity rate.}$$

Because the AER is set by DOL, the piece rates proposed by growers determine the productivity rate.

12. For example, certain Virginia apple growers offered workers 32 cents per box (a box is one-eighth larger than a bushel) in 1978 when the AER for Virginia was $2.71. This required a worker to pick 68 boxes of apples a day to earn the AER. By 1981, the AER had increased to $3.81 but the piece rate had only risen four cents. At this rate, a worker would have to pick 85 boxes of apples per day to earn an amount equivalent to the AER. The growers would have the benefit of these increases, that

such increases were improper from the very beginning, the Court will require DOL to apply the productivity rates in effect in 1977,[13] before the growers were permitted to escalate them.[14] Presumably, the 1977 rates will best reflect the most accurate rates of productivity because these were the rates established before DOL misapplied its own regulations. By applying the productivity rates established by the growers and approved by DOL in 1977 before the tainted interpretation was applied, the Court may defer to the agency's own expertise.[15]

An order in accordance with the foregoing will be issued of even date herewith.

## ORDER

The Court has before it plaintiffs' motion for class certification, defendants' opposition thereto, plaintiffs' reply, and the entire record herein. The Court is satisfied that the proposed class meets all of the requirements of Fed.R.Civ.P. 23(a) and 23(b)(2). Indeed, defendants do not even argue that these requirements are unsatisfied. Defendants sole objection to class certification is that it is unnecessary. The Court finds, however, that allowing this action to proceed as a class action will permit the Court to provide broad relief which would otherwise be unavailable. Accordingly, it is, by the Court, this 27th day of June, 1983, hereby

ORDERED that plaintiffs' motion for class certification is granted; and it is further

ORDERED that the plaintiff class shall consist of all persons who, whether United States nationals, citizens or aliens, are legally permitted to work permanently within the United States and who (a) were employed to pick apples in West Virginia by Ewers Orchards, Mount Levels Orchards, Tri-County Growers, Inc., or any agent or member of Tri-County Growers, Inc. at any time during the 1982 harvest, or (b) intend to seek employment as farmworkers in future harvests in states in which employers have used or intend to use workers temporarily admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii).

## ORDER

For the reasons set forth in the memorandum opinion of even date herewith, it is, by the Court, this 28 day of June, 1983 hereby

ORDERED that plaintiffs' motion for summary judgment is granted and defendants' motion for summary judgment is denied; and it is further

ORDERED that the Court grants relief on behalf of a class consisting of all persons who, whether United States nationals, citizens or aliens, are legally permitted to work

they were improperly allowed to impose on their workers between 1978 and 1981, if the Court were not to apply the 1977 rates. Further, the 1977 rates will protect workers in the future.

**13.** If a grower did not apply for temporary labor certification until after 1977, the productivity rate applied to that grower shall be the rate used in the first year for which he sought certification.

**14.** This is not inconsistent with the declaration, in *NAACP I* that the productivity rate should be set at 80 bushels per day. In that phase of the case the rates of three West Virginia growers were at issue. All of these growers established 80 bushel productivity rates in 1977 and remained at that rate until 1980. Because this phase of the case deals with all growers who receive temporary labor certification, and different growers have different rates, it would be

inappropriate for the Court to set one flat rate for all growers in all states involved in this class action.

**15.** Defendants argue that the Court should not adopt the 1977 productivity rates because to do so would be granting the retroactive relief which the Court rejected in *NAACP I*. This argument is fallacious for two reasons. First, the Court is not granting retroactive relief. The Court is here establishing the productivity rate that must be applied prospectively. The relief granted does not become "retroactive" merely because the Court determines that the 1977 rates are appropriate. Second, the Court did not reject this argument in *NAACP I*, nor did defendant raise it. In *NAACP I* the Court declined to grant retroactive relief to workers who were underpaid in 1980 and 1981. The determination of what rates should be applied prospectively to those who *are* granted relief is an independent question.

permanently in the United States and who (a) were employed to pick apples in West Virginia by Ewers Orchards, Mount Levels Orchards, Tri-County Growers, Inc., or any agent or member of Tri-County Growers, Inc., (the "West Virginia Growers") at any time during the 1982 harvest, or (b) intend to seek employment as farmworkers in future harvests in any state in which employers have used or intend to use workers temporarily admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii) (the "affected states"); and it is further

ORDERED that defendants shall set the 1982 AER for West Virginia at the rate of $4.24 per hour, a figure 17.2% above the 1981 rate, in accordance with the figures produced by DOL's chosen methodology; and it is further

ORDERED that defendants shall take all necessary steps to ensure that the West Virginia growers pay back wages to their employees who worked during the 1982 apple harvest to bring their wages to the level they would have earned had their wages been based on an AER of $4.24 per hour and piece rates of 43 cents per bushel or 48 cents per box; and it is further

ORDERED that unless and until defendants' obligations are altered by promulgation of a valid rule, defendants shall determine on an annual basis the AER for each affected state, and for each year after 1983 such rates must be determined no later than March 31st; and it is further

ORDERED that defendants shall collect and compile information necessary to enable the Secretary of Labor or his designated subordinates to determine the AER and shall begin processing a proposed rule regarding AER methodology for the 1983 season for *all* affected states, and shall publish in the Federal Register the 1983 AER for all affected states no later than July 29, 1983; and it is further

ORDERED that defendants are enjoined from granting temporary labor certification for 1983 (under the provisions of 20 C.F.R. §§ 655.0 *et seq.*) to any employer that does not agree (a) to pay all workers their proper wages based on the 1983 AER determined by defendants upon conclusion of the rulemaking proceedings and (b) to take all appropriate action to ensure that workers in the 1983 harvest will receive all pay due to them should the AER not be established until after the harvest season has commenced; and it is further

ORDERED that defendants are enjoined from granting temporary labor certification to any employer that fails to adjust its piece rate so that an employee, working at the same productivity rate required to earn the then-applicable AER in 1977 or the year in which the employer first applied for temporary labor certification, whichever year is later, may earn the current AER.