**FREDERICK COUNTY FRUIT GROWERS ASSOCIATION INC., et al., Plaintiffs,**

v.

**Elizabeth DOLE, Secretary of Labor, et al., Defendants,**

and

**Cedrick Turner, et al., Defendants–Intervenors.**

**Civ. A. No. 87–1588 (CRR).**

United States District Court, District of Columbia.

March 1, 1991.

Thomas E. Wilson, Christopher A. Weals and Mary Beth Sullivan of Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., with W.A. Johnston of Harrison & Johnston, Winchester, Va., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Judry L. Subar, Sandra M. Schraibman and Harry Sheinfeld, Washington, D.C., for defendants.

Shelley Davis of Migrant Legal Action Program, Washington, D.C., Edward J. Tuddenham of Richards, Wiseman & Durst, Austin, Tex., Garry G. Geffert of West Virginia Legal Services, Martinsburg, Va., and Gregory Schell of Florida Rural Legal Services, Lake Worth, Fla., for defendants-intervenors.

CHARLES R. RICHEY, District Judge.

The Court was under the impression that its comprehensive January 17, 1989 Opinion had finally laid the above-captioned case to rest by granting summary judgment for the Department of Labor ("DOL") and granting the defendant-intervenor Farmworkers' summary judgment motion as to the plaintiff Growers' back-wage liability for 1983 and 1985. *See Frederick County Fruit Growers Ass'n v. McLaughlin,* 703 F.Supp. 1021 (D.D.C.1989) [hereinafter *FCFGA* ]. However, since then the Growers filed a motion for reconsideration in light of the Supreme Court's intervening

decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), and (after a remand by the Court of Appeals) the parties requested the Court's assistance in resolving certain issues affecting the calculation of the Growers' back-wage liability. In this omnibus Opinion, the Court will deny the Growers' motion for reconsideration, will resolve the issues involving the back wages that the Growers owe the Farmworkers for 1983 and 1985, and will decide some miscellaneous outstanding motions.

### I. Impact of Martin v. Wilks

The Growers' motion for reconsideration must fail because this case differs from the Supreme Court's *Martin* decision in several significant ways. Although *Martin* involved a collateral attack on an earlier court order and the Growers brought this lawsuit to collaterally attack this Court's earlier rulings in a separate lawsuit by the Farmworkers challenging DOL's interpretation of 20 C.F.R. § 655.207(c), *see NAACP, Jefferson County Branch v. Donovan,* 558 F.Supp. 218 (D.D.C.1982) (*NAACP I*); *NAACP, Jefferson County Branch v. Donovan,* 566 F.Supp. 1202 (D.D.C.1983) (*NAACP II* ), the similarities end there. First, *Martin* involved a collateral attack on a *consent* decree whereas here the Growers are trying to overturn a final court order granting declaratory and injunctive relief *despite* DOL's vigorous litigation efforts. Second, the *Martin* litigation, which addressed charges of Title VII employment discrimination made first by black firefighters and then by white firefighters against their employer, involved "private rights." By contrast, the litigation at issue here implicates "public rights" because it focuses upon whether a federal agency properly interpreted and applied its regulations affecting numerous individuals and entities throughout the country and whether that agency violated the Administrative Procedure Act ("APA") when complying with this Court's *NAACP* rulings.[1] Third, while the defen-

---

1. This distinction is especially important because it shows that the Growers' argument

stretches *Martin* beyond recognition. Although the majority opinion in *Martin* is written in

dants in *Martin* justified their admittedly race conscious employment decisions as compelled by the earlier consent decree, *see Martin*, 490 U.S. at 759–60, 109 S.Ct. at 2183–84, here DOL does not use the Court's *NAACP* rulings to justify otherwise illegal action, arguing instead that an agency's compliance with a federal court order simply cannot be an APA violation.[2]

 In any event, even if *Martin* were sufficiently on point to permit the Growers to collaterally attack the injunctive relief achieved by the Farmworkers against DOL in the *NAACP* litigation, *Martin* has nothing to do with the Court's back-wage rulings, which were based upon equitable restitution and contract law principles and are the rulings now contested by the Farmworkers.[3] As the Court made clear in its January 17, 1989 Opinion, it granted summary judgment for DOL because the Growers were collaterally estopped from attacking the results of *NAACP I* and *NAACP*

II, *see FCFGA*, 703 F.Supp. at 1028, but held that this conclusion "does not dispose of the Growers' actual wage obligations," *id.* The Court went on to hold that the Growers were liable for back wages for 1983 under an equitable restitution theory, *see id.* at 1028–29 (Growers paid average worker piece rate in reliance on new DOL regulation of "dubious validity," which was later found to be invalid, and in direct violation of this Court's order), and for 1985 under contract law, *see id.* at 1030–31 (by amending their job clearance orders to include promise to pay proportional increase rate, Growers received DOL certification and entered into contracts with Farmworkers to pay higher wages). The Court made these two rulings independently of the collateral estoppel effect of the previous *NAACP* litigation, and the *Martin* decision simply does not undermine, or even implicate, these back-wage rulings.[4]

broad terms and significantly affects the manner in which employment discrimination cases may be successfully brought and resolved, this Court sees no indication in that opinion or any other subsequent case that the *Martin* Court intended to fundamentally alter administrative law principles and the process by which federal agency action is challenged in court. In the *NAACP* litigation, the Farmworkers properly sued DOL over its interpretation and implementation of DOL regulations and obtained declaratory and injunctive relief. The *NAACP* rulings undoubtedly affected the Growers' *financial* interests (to the extent that the terms and conditions of the DOL's labor certification program changed), but that does not mean that their *legal* interests were impaired. In other words, as the Court already ruled, the Growers were not indispensable parties to the *NAACP* litigation. *NAACP I,* 558 F.Supp. at 223–24; *see* 3A *Moore's Federal Practice* ¶ 19.07[2.–0, at 19–99–19–01 (the "interest" that makes an absent entity a party necessary for just adjudication of an action must be "a legally protected interest, and not merely a financial interest"; in "public rights" litigation, "non-parties who may be adversely affected by a decision in plaintiff's favor do not have a protectable interest which would require their joinder under Rule 19"). Without further evidence that the Supreme Court intended such a far-reaching result, the Court will not accept the Growers' interpretation of *Martin,* which would require the joinder of any person or entity affected by a regulation whenever a plaintiff sues the federal agency over its interpretation and implementation of that regulation.

**2.** *Cf. GTE Sylvania, Inc. v. Consumers Union of United States, Inc.,* 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980) (federal agency did not violate Freedom of Information Act and did not improperly withhold documents that otherwise would have been released to requester-plaintiffs because federal injunction obtained in separate action by manufacturers who had submitted documents prevented agency from releasing documents).

**3.** All the parties agree that DOL's promulgation of new regulations to replace the regulations challenged in the *NAACP* litigation together with the Court of Appeals' final rejection of a challenge to the new regulations, *see AFL–CIO v. Dole,* 884 F.2d 597 (D.C.Cir.1989), renders moot the injunctive relief which this Court granted in *NAACP.* However, the parties also agree that this Court's rulings holding the Growers liable for back wages for 1983 and 1985 are unaffected by DOL's new regulations.

**4.** Nor may the Growers evade their contractual obligations to the Farmworkers by arguing that they entered into the contracts under duress, promising to pay the proportional piece rate only to gain access to workers under DOL's H–2 certification program. In a related case, the Fourth Circuit rejected that kind of argument when it stated that the Growers had two options—use only domestic labor to harvest their fruit or pay the rates set in *NAACP II,* obtain DOL certification and then recoup the wages from workers if the rate paid was later determined to have been too high—and implied that the Growers had the additional option of seek-

Therefore, the Court will deny the Growers' motion for reconsideration or for certification of an interlocutory appeal based upon *Martin.*[5]

## II. Calculation of Growers' Back–Wage Liability

The parties have represented to the Court that they have gathered the necessary data and have agreed on the mechanics of calculating the Growers' back-wage liability and establishing who belongs in the defendant class in accordance with the Court's January 17, 1989 Opinion granting summary judgment for the Farmworkers for 1983 and 1985. *FCFGA,* 703 F.Supp. 1021. However, the parties also agree that, before they can make those calculations, the Court must resolve certain factual and legal issues which the 1989 Opinion did not address. Once the Court has decided these disputes, the parties have promised to cooperate in determining the final liability figures. The broad legal issues can be boiled down to whether the extent of the Growers' liability depends upon the notices they received from DOL and whether various kinds of bonus payments should be counted. The Court will address these disputes in turn, and will then resolve certain more narrow legal and factual disputes.

### A. Effect of DOL's Notices to Growers

■ Several contested issues arise out of a basic disagreement over the legal effect of notices that DOL sent to the Growers in 1983 and 1985 to inform them of the proportional increase rates. The Growers ar-

gue that since DOL failed to provide them with timely notice of the correct proportional increase rates and since the Growers relied on those notices, they may not be held "retroactively" liable for any increases not contained in the notices they received. However, this argument has several serious flaws. First, it overlooks the reality that the formula for calculating the proportional increase rates was set by the Court in *NAACP II* and that therefore the Growers' liability to pay the proper rates is not "retroactive" but actually pre-dated the DOL notices. Second, because DOL was under extreme time pressure to mail out notices after this Court's rulings but before the start of the harvest season in both 1983 and 1985, it sent some notices late, neglected to mail every grower a notice, and usually set forth in its notices, as an example, the calculation of only one proportional increase rate. Third, by arguing that the DOL notices place a cap upon their liability, the Growers fail to realize that their liability, existing independent from the DOL notices, was inextricably tied to the *NAACP II* formula because of equitable restitution principles (for 1983) and because they had contractually bound themselves to pay rates in accordance with *NAACP II* (for 1985). Finally, the reliance argument must fail in any event because, to the extent that the Growers relied on the notices, their reliance was unreasonable considering the circumstances existing at the time and everything that had gone before. With the foregoing general principles in mind, the Court will briefly address individually the four contested issues (Nos. 1, 2, 3, and 6)[6]

ing an injunction in *this Court* prohibiting DOL from conditioning H–2 certification on their promise to pay the *NAACP* rate. *See Feller v. Brock,* 802 F.2d 722 (4th Cir.1986) (reversing preliminary injunction obtained by Growers in West Virginia district court primarily because it conflicted directly with this Court's *NAACP* injunction).

**5.** In addition, the Growers' Supplemental Memorandum in Support of Motion for Reconsideration, while using different words than the Court has seen before, makes the same argument that the Growers have made in this Court since 1987 in attempting to persuade the Court to re-open old and stale litigation which was vigorously

contested by DOL and of which the Growers were aware from the beginning. For that reason and also because the supplemental memorandum repeatedly and unnecessarily makes *ad hominen* attacks upon the Farmworkers' counsel, the Court will deny the Growers' Motion for Leave to File this vitriolic supplemental memorandum. This denial renders moot the Farmworkers' Motion to Strike.

**6.** For ease of reference and to avoid confusion, the Court will use the terminology of the Growers' and Farmworkers' Joint Motion to Resolve Issues Necessary for Calculation of Judgment, which identified Contested Issues Nos. 1–8 that needed to be resolved.

that center upon this notice/reliance argument.

■ Contested Issue No. 1 arises because, in many instances, each grower paid different piece rates depending upon the time and effort required for different kinds of picking activity.[7] The Growers argue that because most of the DOL notices only calculated one proportional increase rate, each grower who received such a notice but paid more than one rate justifiably "assumed" that the proportional increase rate applied only to the grower's highest rate and that it was not required to increase all of its rates. The problem with this argument is that nothing in the *NAACP* litigation or in this case restricted the Court's rulings, requiring the Growers to pay the proportional increase rate, to only one rate. In 1983 when the DOL sent the Growers notices which used the term "piece rate*s*" and sent them copies of this Court's *NAACP II* opinion, there was no hint that any grower could properly discharge its regulatory duty by increasing only one of its piece rates.[8] Similarly, in 1985 when the Growers amended their job clearance orders to state that "the employer will pay piece rate*s* at least equal to those required by 20 CFR 655.207(c) ... as interpreted by the Court in [*NAACP II*]," Farmworkers' Reply Mem., Exh. 1 (emphasis added), that was an unequivocal, contractually binding promise which applied to *all* piece rates paid by each grower. Because the Growers' regulatory and contractual obligations pre-existed any DOL notices, the Growers may not now evade those obligations by wearing blinders and ignoring everything that preceded the notices.[9]

■ In addition, even assuming *arguendo* that this kind of reliance argument were theoretically available, it would not succeed here because the Growers' actions were not reasonable. The Growers concede that their reliance argument has merit only if they *reasonably* relied on the DOL notices. However, as the foregoing discussion demonstrates, there was simply no reasonable basis for the Growers to "assume" or "conclude" (the Growers' terms) that only one of their rates would need to be affected by the proportional increase rate calculus ordered in *NAACP II.* Rather than reaching the far-more reasonable conclusion that each of their rates would have to be increased or taking the reasonable step of calling the telephone number supplied in the DOL notice to inquire about how they should implement this Court's rulings, the Growers merely selected the least costly and least reasonable alternative. In short, even if the Growers' assumptions and conclusions can be termed "reliance," the Court holds that they were not reasonable and should not be rewarded. Therefore,

7. For example, the growers in New York's Hudson Valley apparently pay two piece rates: one for picking apples off trees and another for picking "drops" (apples that have fallen to the ground and are sold for juice). By comparison, in Western New York three rates are prevalent: one for picking higher-quality "fresh market" apples to be sold at roadside markets or grocery stores; another for picking lower quality "processing fruit" sold to processors to be used for apple sauce and other apple products, and a third for "drops." In some of the New England states, the growers have one piece rate for "spot" picking (picking selectively for color and ripeness), a different rate for "strip" picking (picking all the apples off the tree at once), and yet another rate for "drops."

8. The Court rejects the argument that some, if not all, of the Growers had to rely on DOL's calculations because they were such unsophisticated business people that they were unable to calculate what their own proportional increase piece rates should be in accordance with the *NAACP II* Opinion they all received. The Growers had been well acquainted with the issues resolved in the *NAACP* litigation, and each grower was sufficiently sophisticated to make various complex crop predictions and economic calculations needed to run its business with any degree of success. Moreover, the Growers have argued that the piece rates they must pay to their workers have a significant impact upon their *yearly economic calculations. This* indicates that each grower—who after all was in the best position to know what its various rates were—should have been perfectly capable of making the proper adjustments to this crucial part of its business in accordance with the Court's rulings and without DOL's assistance.

9. It should be noted that, according to DOL official Robert Haverkamp, DOL agrees with the Farmworkers that the Growers were supposed to pay the proportional increase rate for each of the various piece rates they paid for different harvest activities.

the Court resolves Contested Issue No. 1 in the Farmworkers' favor, holding that each grower is liable for back wages for the proportional increase rate as applied to each different rate that it paid for different harvesting activities regardless of what calculation the DOL notice contained.

For essentially the same reasons, the Court also resolves Contested Issue No. 2 in the Farmworkers' favor. The Growers argue that the three growers who received DOL notices with incorrectly calculated proportional increase rates and paid those rates should not now be held liable for the correct (higher) rate. Again, this argument reflects a fundamental misunderstanding of what triggered the Growers' proportional increase liability. They had entered into binding contracts (by amending their job clearance orders in 1985) to pay certain proportional increase rates as soon as the Court's *NAACP II* ruling became a final judgment. Entry of the final judgment triggered the Growers' obligation to increase all of their piece rates. Thus, § 655.207(c) together with the Court's interpretation of that regulation in the *NAACP* litigation—and not a DOL notice— set the legal parameters of the amount to be paid by each grower. Moreover, the plain regulatory language placed the burden on the Growers to increase their piece rates each time the applicable adverse effect wage rate ("AEWR") was increased. *See* 20 C.F.R. § 655.207(c) (1980).[10] The foregoing demonstrates that those growers whose DOL notices set forth an incorrectly calculated proportional increase rate benefitted from a windfall and paid lower piece rates than they had promised the Farmworkers in their job clearance order amendments. Because there is no reason why the Farmworkers should bear the brunt of DOL's errors and because these three growers have no legal entitlement to the

"bargain-level" labor they fortuitously received, the Court holds that these growers are liable for back wages despite their compliance with incorrectly calculated DOL notices.

The Court reaches a similar result with respect to Contested Issue No. 3, which revolves around when the Growers' back-wage liability began. The Growers argue that their obligation to pay the proportional increase rates began once they received DOL notices and that therefore their liability does not extend throughout the entire 1983 and 1985 seasons. However, the Growers' 1983 job clearance orders required them to pay piece rates set in accordance with the "applicable" DOL regulations, which for that entire season, except September 2–7, 1983,[11] was the proportional increase rate. Along similar lines and as previously noted, the Growers' contractual obligation in 1985 to pay the proportional increase rate began, in accordance with the terms of their job clearance amendments, as soon as the *NAACP II* judgment became final on August 15, 1985. Therefore, the Growers are liable for paying back wages at the proportional increase rates for all of the 1983 season, except for September 2–7, and for all of the 1985 season beginning on August 15.

The same logic leads to a comparable result on Contested Issue No. 6, which is the result of DOL's admitted error in approving job clearance order amendments filed by members of the Frederick County Fruit Growers Association ("FCFGA") in 1983. Although the parties do not dispute that the proportional increase rate in 1983 for most, if not all, FCFGA members was 50.1 cents, DOL erroneously approved the FCFGA members' amended job clearance orders that contained a lower rate of 44 cents. Therefore, these growers argue

10. For a complete description of the AEWR, see *NAACP I*, 558 F.Supp. at 219–220.

11. On September 2, 1983, DOL promulgated new regulations (the "average worker" piece rate regulations) to supersede § 655.207(c). However, in an unpublished order filed September 8, 1983, this Court enjoined implementation of these new regulations, and (after an interim remand) the Court of Appeals ultimately invalidated them. *See NAACP, Jefferson County Branch v. Donovan*, 765 F.2d 1178 (D.C.Cir. 1985). Thus, except for that window of September 2 through September 7, the applicable DOL regulation for the 1983 season was the proportional increase rate set forth in § 655.207(c) as interpreted by this Court in its *NAACP* rulings.

that, if they are held liable for any back wages, it should only be at the 44 cent rate. As an initial matter, their reliance argument is not particularly strong because many, if not all, of the FCFGA members continued to pay a lower rate and even failed to raise their wages to the incorrect 44 cent rate. In any event, the outcome of this issue depends, once again, upon an examination of this Court's *NAACP II* ruling. The last ordered paragraph of *NAACP II* enjoined DOL from granting temporary labor certification to any grower who failed to adjust its wages to pay at least the proportional increase rate. *See NAACP II,* 566 F.Supp. at 1210. Thus, by granting certification to FCFGA members at the 44 cent rate, DOL violated this Court's injunction—albeit inadvertently in a good faith effort at compliance. Based upon the entire record before the Court of the Growers' actions, the Court sees no reason why the FCFGA members should benefit from—and why the Farmworkers should be harmed by—DOL's violation of this Court's *NAACP II* injunction. Moreover, in their 1983 job clearance orders, the Growers promised to pay piece rates set in accordance with applicable DOL regulations, and this Court's *NAACP II* interpretation of those regulations necessarily overrides any of DOL's subsequent, erroneous interpretations. For the foregoing reasons, the Court holds that the FCFGA members' 1983 back-wage liability must be calculated by referring to the correct proportional increase piece rate (50.1 cents in almost all instances).

### B. Growers' "Bonus" Payments to Farmworkers

 Contested Issue No. 4 involves the broad question of whether the minority of growers who paid various types of wage enhancements or supplements to their employees should be permitted to credit those "bonus" payments against the amount of their back-wage liability. A full exploration of this issue requires a brief explanation of the manner in which proportional increase rates are calculated in accordance with this Court's *NAACP* rulings. For each grower, the first year (usually 1977) that it entered DOL's temporary labor certification program is the "base" year used to set that grower's productivity rate. *See NAACP I,* 558 F.Supp. at 223. As the term implies, the proportional increase rate changes in proportion to a change in the AEWR promulgated yearly by DOL, while the productivity rate must remain constant. *Id.* In its opinion granting summary judgment for the Farmworkers, the Court ordered the Growers to pay the Farmworkers back wages for 1983 and 1985 "in an amount equal to the difference between the wages actually paid and wages calculated pursuant to the rulings of this Court in [*NAACP I* and *NAACP II* ]." *FCFGA,* 703 F.Supp. at 1034. Seizing upon the term "wages actually paid," the Growers argue that the bonuses paid by some of them should be counted as wages actually paid to reduce their back-wage liability.

However, this argument misconstrues the Court's *FCFGA* ruling to reach a result which, if accepted, would require a calculation that compares apples and oranges. Because none of the parties raised this issue during the prior proceedings in this case,[12] the Court did not consider the "bonus issue" in making its basic determination that the Growers must pay the difference between the applicable proportional increase rates each grower should have paid and the rates they actually did pay their employees. Nevertheless, a fundamental premise of the Court's *FCFGA* opinion, as well as its earlier rulings in *NAACP I* and *NAACP II,* was that the proportional increase rate could not be calculated without reference to the base year.[13] Throughout this protracted litiga-

---

**12.** In fact, the parties first raised this bonus issue on appeal, which caused the Court of Appeals' remand.

**13.** The extensive body of case law setting forth principles governing damages calculation in breach of employment contract and Fair Labor Standards Act cases that the Growers cite are inapposite because resolution of this "bonus" issue depends to such a great extent upon this Court's interpretation of its earlier *FCFGA* and *NAACP* rulings. The Growers admitted as much when they recently argued against the appointment of a Special Master: "This Court alone

tion, the parties have been using wages paid by each grower in its base year to calculate each grower's applicable proportional increase rate, and any bonuses or wage enhancements that may have been paid never entered into those calculations. Now, at the tail end of this litigation, the Growers are trying to change the rules of the game, advocating a calculation that compares wages paid in a base year—not taking bonuses into account—with wages paid in 1983 or 1985—taking bonuses into account.

The Growers may have apples or oranges, but they cannot have both, which is in effect what crediting the bonuses against their back-wage liability would be. If the Court were writing on a blank slate, it would seem to the Court comparable, in terms of fundamental fairness, to require *either* a calculation that takes bonuses into account for both the base year and the subsequent year *or* a calculation that does not count bonuses on either side of the scale. However, in view of everything that has already happened in this case, the Court holds that the latter calculation is preferable because: (i) it would be expensive and difficult—if not impossible in many instances—for the parties to determine which growers paid bonuses over thirteen years ago and what those amounts were; (ii) the parties have already expended considerable effort and resources in calculating each growers' back-wage liability; and (iii) the Growers were in the best position of any party to know about this issue but failed to raise it in a timely fashion.

Another important reason why this Court rejects the Growers' bonus argument is that they again are attempting to unjustly enrich themselves at the Farmworkers' expense. The agreement struck between each grower and its workers, as reflected in the job clearance orders, was that the grower would pay a certain minimum piece rate for the workers' performance of certain minimum picking tasks. However, certain growers paid their workers additional amounts as bonuses that can be grouped into four general categories: (1) "quality bonuses" to encourage slower picking so that the apples would not be bruised and could be sold for a higher price on the fresh market; (2) "hardship bonuses" paid to workers picking in sections of an orchard where the fruit was relatively sparse or had been damaged by adverse weather or other conditions; (3) "across-the-board hardship bonuses" paid to all workers by growers whose entire orchard had a bad harvest; and (4) "season end bonuses" paid to encourage workers to remain through the end of the harvest when fruit was sparse.

These bonuses share one important characteristic, namely rewarding the worker for performing extra work or agreeing to earn less money on a piece-rate basis.[14] In other words, a worker picking fruit more slowly and carefully than he or she would otherwise do, necessarily picks less fruit and receives a lower piece rate wage, but in return for picking a better-quality product that worker receives an additional payment. Similarly, a worker picking in an orchard, in a part of an orchard, or at a time in the harvest season in which the fruit is more sparse or more damaged than normal picks less fruit and therefore earns a lower wage, but in return for picking under less-than-optimum conditions and not taking his or her labor elsewhere that worker receives a bonus. The foregoing demonstrates how unjust it would be to

---

devised the proportional increase piece rate formula; as a result, this Court alone should apply the requirements of that formula to the contested issues presented in this case." January 23, 1991 Letter from Growers' Counsel Thomas Wilson at 3.

**14.** Whether the bonuses were paid for "extra work" or were paid to compensate the workers for picking more slowly, which resulted in lower production, is a semantic difference that does not affect the Court's reasoning. For example,

perhaps picking more slowly could be considered "less work," but when a worker is being paid by the amount of fruit picked, picking more slowly means earning less money. In any event, the Growers admit that the bonuses were not gifts but rather were paid as incentives to reward workers for picking more carefully or under hardship conditions. *See* Growers' Opposition to Farmworkers' Mem. Regarding Bonus Payments at 7. In short, each grower who paid bonuses received a benefit in return.

allow the Growers to reduce their back-wage liability by the bonuses paid. Each grower who paid bonuses received the benefit of its bargain and should not now be permitted to obtain a windfall by, in effect, taking those bonuses back.

### C. Remaining Narrow Legal and Factual Issues

■ Contested Issue No. 5 affects only those growers who entered the program in 1985. The Growers argue that, for those growers, the base year is 1985—their first year in the program—and that those growers therefore should be dismissed because there was no increase between their base rate AEWR and the 1985 AEWR. However, this argument overlooks the fact that most of these growers submitted their job clearance orders before DOL had promulgated its 1985 AEWR and that, as a result, the piece rates they offered were based upon the 1984 AEWR. Therefore, under the Court's *NAACP II* ruling, once DOL promulgated the 1985 AEWR, which happened before the season began, those growers participating in the H-2 program for the first time in 1985 were required to increase their piece rates—without increasing their productivity—in proportion to the increase in the AEWR.[15] Like all the growers who had participated in the program before, these new entrants promised in their job clearance orders to pay applicable wage rates in accordance with 20 C.F.R. § 655.207(c) as interpreted in *NAACP II.*

■ Subsumed within Contested Issue No. 7 are several disputes concerning the calculation of specific growers' back-wage liability. Some of these disputes involve the amount paid by the grower while others involve the grower's entry year. First, C.L. Robinson contends that it should not be a member of the Growers class because, rather than paying a piece rate, it paid an hourly rate together with an incentive "bonus" once a worker had picked a certain number of boxes. However, the Court's review of the record leads to the conclusion that C.L. Robinson must remain in the class because it paid a "disguised" piece rate. In effect, DOL agreed with this conclusion when it rejected C.L. Robinson's 1986 H-2 application that was identical to its 1985 application that DOL admittedly erroneously approved. As the Court has discussed in greater detail above, there is no reason why those workers who provided labor for C.L. Robinson should pay for DOL's erroneous approval of that grower's application.

■ Similarly, the Court rejects the argument that Golden Harvest Farms should be dismissed from this lawsuit. After promising to pay a piece rate on its job clearance orders, it unilaterally began paying a hybrid hourly/piece rate, despite DOL's refusal to approve this change. By rejecting this proposed amendment, DOL prevented this new payment method from becoming part of the contract between Golden Harvest and its workers, and therefore that grower is properly a member of the Grower class.

■ Nor may Leavitt Orchards and Pine Hill Orchards be heard to argue that, even though their pay records show that the piece rates they paid were too low, they actually did pay the proportional increase rate in 1985 by crediting their workers with higher production levels than they had actually achieved. These two growers concede that their pay statements were incorrect but argue that the Court should look beyond these "minor" misstatements to what the growers "really" paid their workers. However, the Court declines this invitation. The Court must rely on the two growers' wage statements, which are required to state the actual wage paid, *see* 20

---

**15.** The parties' stipulated formula—namely (wage paid in base year) X (percentage increase in AEWR from base year to 1985) = 1985 proportional increase rate—can be used to arrive at the same result. In effect, most of the new entrants to the temporary labor certification program calculated their piece rates based upon

a *1984* AEWR. Thus, contrary to the Growers' argument, when that 1984 base year AEWR is used in the foregoing formula, the result is a proportional increase rate for 1985 that is different from the piece rates calculated with the 1984 AEWR.

C.F.R. § 655.202(b)(8)(ii), and therefore bind the growers.

▮ The Court will briefly turn to the entry year component of Contested Issue No. 7. Although H.F. & T.B. Byrd ("Byrd") may not have *employed* any H–2 workers until 1985, according to DOL (and not contradicted by the Growers) it first *applied* for temporary labor certification under the H–2 program in 1977. Because when Byrd first hired workers is irrelevant for the purposes of the entry-year determination, the Court holds that its base year is 1977. *See NAACP II*, 566 F.Supp. at 1210 (base year is "1977 or the year in which the employer first *applied* for temporary labor certification, whichever year is later" (emphasis added)). The Court also rejects the argument that Long Hill's entry year should be 1985 merely because that is when it came under new ownership. Long Hill was sold on August 12, 1985, *see* Growers' Mem. Regarding Contested Issues, Exh. O, but the entire H–2 program application was completed by the prior owners and approved by DOL for the entire 1985 season on August 9, 1985, *see* Farmworkers' Reply, Exh. 18, *before* the sale of the orchard. Therefore, 1985 was not the first year of new ownership, and the DOL-provided year of 1977 must apply. Furthermore, the Court concludes that the entry year for B & E Orchards is 1978 because that is what DOL's records reflect and because the Growers' Memorandum Regarding Contested Issues does not argue to the contrary.

Finally, Contested Issue No. 8 is a misnomer since nothing seems to be contested any longer. The Farmworkers argue that the data gathered from DOL on six growers,[16] who apparently have refused to comply with the Farmworkers' discovery requests, are accurate and should be adopted by the Court as set forth in Exhibit A attached to the parties' Joint Motion. The Growers have not responded to this contention, apparently because the Growers' counsel have moved to withdraw from representing those growers. Under these circumstances, the Court has no basis for concluding that the data provided by DOL for these six growers and compiled in Exhibit A is not accurate.

### III. Miscellaneous Motions

▮ As indicated above, the Farmworkers have encountered some difficulties obtaining discovery from certain growers. Therefore, they filed two motions (one as to Ewers Orchards and one as to K & W Farms, John D. Wood, and Darrell Worley) to compel compliance with discovery requests. The Growers' counsel responded to these discovery motions by filing a motion to withdraw from representing these four growers,[17] on the grounds that their clients were refusing to cooperate with them in responding to the Farmworkers' discovery requests. Though sympathetic to the plight of the Growers' counsel in dealing with these recalcitrant clients, the Court, in the exercise of its discretion, holds that granting their motion to withdraw at this late stage in the litigation would do more harm—especially to the Farmworkers who oppose the motion—than good. Therefore, the Court will grant the Farmworkers' two motions to compel and will deny the Growers' counsel's motion to withdraw. However, should it become necessary in the future, the Court will adopt the Farmworkers' suggestion that, once the Growers' counsel forward their discovery requests to the uncooperative growers, the Court will not hold *counsel* responsible in terms of possible sanctions should the growers continue to be unresponsive. The Court will issue an Order of even date herewith in accordance with the foregoing Opinion.

### ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 1st day of March, 1991,

16. Ewers Orchards, K & W Farms, John D. Wood, Darrell Worley, Bloom Orchards, and Overlook Orchards.

17. Apparently, two other growers (Bloom Orchards and Overlook Orchards) are in the similar position of having refused to comply with discovery requests. The Court has previously denied the Growers' counsel's motion to withdraw from representing these two growers.

ORDERED that the Plaintiffs' Motion to Reconsider Summary Judgment in Light of *Martin v. Wilks* or, Alternatively, to Certify Question for Appeal shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Plaintiffs' Motion for Leave to File Supplemental Memorandum shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Defendant–Intervenors' Motion to Strike shall be, and hereby is, DENIED as moot; and it is

FURTHER ORDERED that all of the agreed-upon issues set forth in Section I of the Growers' and the Farmworkers' Joint Motion to Resolve Issues Necessary for Calculation of Judgment shall be, and hereby are, ADOPTED by the Court; and it is

FURTHER ORDERED that the Growers' back-wage liability shall be calculated by applying the proportional increase rate formula set forth in *NAACP, Jefferson County Branch v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983) (*"NAACP II"*) to *all* of their harvesting rates including, but not necessarily limited to, each grower's "process," "strip," and "drop" rates; and it is

FURTHER ORDERED that the three growers who received Department of Labor ("DOL") notices setting forth incorrect proportional increase rates nevertheless shall be, and hereby are, required to pay back wages to the Farmworkers in accordance with their proportional increase rates as correctly calculated in accordance with *NAACP II;* and it is

FURTHER ORDERED that, regardless of when or whether any of the growers received a DOL notice, the Growers shall be liable for the proportional increase rates calculated in accordance with *NAACP II* for all of the 1983 harvest season, except for September 2 through September 7, 1983, and for all of the 1985 harvest season beginning on August 15, 1985; and it is

FURTHER ORDERED that the 1983 proportional increase rate for all members of the Frederick County Fruit Growers Association ("FCFGA") shall not be $.44 but rather shall be the 1983 rate calculated for them in accordance with *NAACP II*, which for most if not all FCFGA members is $.501; and it is

FURTHER ORDERED that, in calculating the Growers' back-wage liability, none of the wage enhancements, supplements, or other bonuses they paid to the Farmworkers in 1983 or 1985 shall be counted for any purpose; and it is

FURTHER ORDERED that each grower who first entered DOL's temporary labor certification program in 1985 and filed job clearance orders before DOL promulgated the 1985 Adverse Effect Wage Rate is liable to the Farmworkers to the extent that such grower failed to adjust its piece rates upwards in accordance with *NAACP II;* and it is

FURTHER ORDERED that C.L. Robinson Corporation, Golden Harvest Farms, Leavitt Orchards, and Pine Hill Orchards shall be, and hereby are, members of the counter-claim defendant Growers' class; and it is

FURTHER ORDERED that the correct entry year for Long Hill (Ladd) Orchards and H.F. & T.B. Byrd, Inc. shall be, and hereby is, 1977 and that the correct entry year for B & E Orchards shall be, and hereby is, 1978; and it is

FURTHER ORDERED that the data provided by DOL as to Ewers Orchards, K & W Farms, John D. Wood, Darrell Worley, Bloom Orchards, and Overlook Orchards and set forth in Exhibit A attached to the parties' Joint Motion shall be, and hereby are, ADOPTED by the Court as accurate and correct; and it is

FURTHER ORDERED that the Defendant–Intervenors' Motion to Compel Plaintiff Ewers Orchards to Comply With Discovery Requests and Defendant–Intervenors' Motion to Compel Plaintiffs K & W Farms, John D. Wood, and Darrell Worley to Comply With Discovery Requests shall be, and hereby are, GRANTED; and it is

FURTHER ORDERED that Plaintiffs' Counsel's Motion to Withdraw as Counsel for K & W Farms, Ewers Orchards, Darrell Worley, and John D. Wood shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the Court's docket, except that the Court shall retain jurisdiction over disputes, if any, involving attorneys' fees and calculation of the Growers' back-wage liability; and it is

FURTHER ORDERED that this Order constitutes the Court's Final Judgment in this case in accordance with 28 U.S.C. § 1291.