Reverend Chester C. THOMPSON, Individually and on behalf of all others similarly situated, Appellants,

v.

Walter E. WASHINGTON, Individually and as Commissioner of the District of Columbia and as "The Authority" of the National Capitol Housing Authority under Executive Order, et al.

Elizabeth MARSHALL et al., Appellants,

v.

Patricia Roberts HARRIS, Individually and in her capacity as Secretary of Housing and Urban Development, et al.

Nos. 75-1789 and 75-1910.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1976.

Decided Feb. 15, 1977.

Edward E. Schwab, Washington, D. C., with whom Patrick J. Christmas, Washington, D. C., was on the brief, for appellants.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees in case No. 75-1789. Wallace H. Johnson, Asst. Atty. Gen., Washington, D. C., at the time the record was filed and Lawrence E. Shearer, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellees in No. 75-1789.

Karen I. Ward, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John R. Dugan, Asst. U. S. Attys., Washington, D. C., were on the brief, for federal appellees in case No. 75-1910.

Steven G. Friedman, Washington, D. C., with whom C. Richard Beyda, Washington, D. C., was on the brief, for Linda Pollin Memorial Housing Corp., and others, in case No. 75-1910.

Before WRIGHT, McGOWAN and Mac-KINNON, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

In *Thompson v. Washington,* 162 U.S. App.D.C. 39, 497 F.2d 626 (1973) (*"Thompson I"*), this court held that tenants of low-rent public housing operated by the National Capital Housing Authority ("NCHA") are entitled to receive notice and an opportunity to make written presentations prior to official approval of any rent increase, and the case was remanded to the District Court for further proceedings not inconsistent with our opinion, *id.* at 643. In *Marshall v. Lynn,* 162 U.S.App.D.C. 56, 497 F.2d 643 (1973) (*"Marshall I"*), *cert. denied,* 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974), decided on the same day, it was held that the same procedural rights must be granted to tenants of a low- and moderate-income housing project constructed and financed by a private nonprofit corporation, the Linda Pollin Memorial Housing Corporation, pursuant to § 221(d)(3) of the National Housing Act, if the project received both FHA mortgage insurance and below-market-interest-rate loans. A remand was made to the District Court to determine whether the project in fact was given below-market-interest-rate loans and, if so, "to enter an appropriate order effecting the procedural rights of tenants . . . ." *Id.* at 648.

These two cases are now before this court on appeals by the two groups of tenants from the respective decisions of the District Court upon remand. The issue in each is whether the District Court improperly limited the scope of the equitable relief awarded to the tenants.

I

The essential point of contention is the degree to which rent increases effectuated prior to this court's decisions in *Thompson I* and *Marshall I,* without the procedural

safeguards set forth in those opinions, must now be undone. In each of the cases at bar, the tenants unsuccessfully attempted to block what later proved to be improperly processed rent increases scheduled to go into effect in 1970. The complaint in *Thompson* was filed in the District Court in October 1969 by the named appellant on his own behalf and on behalf of approximately 6,000 public housing tenants and their families, seeking declaratory and injunctive relief against a rent increase by NCHA intended to take effect in January 1970.[1] On December 24, 1969, the District Court denied a preliminary injunction, and on November 25, 1970, this court left that action undisturbed on the ground that the tenants were unlikely to prevail on the merits. *McKinney v. Washington,* 143 U.S.App.D.C. 4, 442 F.2d 726 (1970). Thereafter, on October 15, 1971, the District Court dismissed Thompson's complaint. Thompson then took the appeal which resulted in this court's decision in *Thompson I.*

The complaint in *Marshall* was filed on July 30, 1970, on behalf of a class defined as all tenants of the Linda Pollin Memorial Housing Project, to enjoin implementation of a rent increase otherwise scheduled to go into effect on August 1, 1970.[2] The District Court did not prevent the increase in rents from being collected, but did grant the tenants a temporary restraining order and preliminary injunction which required that the amount of the increase be placed in an interest-bearing escrow account. However, on July 15, 1971 the District Court, relying heavily on this court's decision in *McKinney v. Washington, supra,* granted summary judgment in favor of the defendants, and several days thereafter ordered that the funds in the escrow account be disbursed to the non-profit owner. The tenants appealed the grant of summary judgment, but did not seek a stay of the District Court's order,

1. The complaint named as defendants the current Mayor of the District of Columbia, Walter E. Washington, who was then a Commissioner of the District; several officials of NCHA; and the Secretary of the Department of Housing and Urban Development ("HUD") and two of his subordinates.

2. Defendants eventually included the Secretary of HUD; officials of the Federal Housing Administration ("FHA"), now a division of HUD; the Linda Pollin Memorial Housing Corporation; and the company which managed the Pollin Project.

nor an injunction during the pendency of the appeal, to preserve the escrow account previously established.

This court's decisions in *Thompson I* and *Marshall I* upheld the merits of the tenants' claims to an opportunity to be heard on proposed rent increases, and reversed the District Court's judgments in favor of the housing officials. They did not address the nature of the relief to be awarded to the tenants. Upon remand to the District Court, tenants' counsel [3] sought the following equitable relief in each of the two cases: (1) reinstatement of the rent schedule in force prior to the disputed increase in 1970; (2) recalculation of rents for the period following that increase, utilizing the procedures for tenant participation set out in *Thompson I* and *Marshall I,* or their equivalent, and restitution of such amounts as might be determined to have been excessive; and (3) an injunction ordering that all future rent increases accord the procedural rights contemplated by *Thompson I* and *Marshall I.* In both cases, however, the District Court declined to reinstate the pre-1970 rents or require reprocessing of the disputed rent increases; denied restitution; and limited relief to a declaratory judgment that future rent increases must be processed under procedures complying with the requirements set out in *Thompson I* and *Marshall I.* *Thompson v. Washington,* Civil No. 3000–69 (D.D.C., June 6, 1975); *Marshall v. Lynn,* Civil No. 2288–70 (D.D.C., June 27, 1975).

Meanwhile, on September 11, 1974, the Department of Housing and Urban Development, which has statutory responsibility for approving any rent increase by a local public housing authority such as NCHA, *see* 42 U.S.C. § 1401 (1970), or a § 221(d)(3) project such as the Linda Pollin Project, *see Marshall I,* 497 F.2d at 645–46, responded to *Thompson I* and *Marshall I* by promulgating regulations, effective in October 1974, guaranteeing tenants affected by subsequent rent increases the procedural rights

mandated by those decisions. 39 Fed.Reg. 32736, *as amended,* 24 C.F.R. Parts 401, 410. At oral argument, tenants' counsel informed us that there has been a recent rent increase at the Pollin Project, utilizing the procedures established by the regulations. Thus, the rent schedule currently in effect at the Pollin Project is in full compliance with the requirements established by this court; and the only issue now before us in the *Marshall* case is whether rents for the time period prior to the properly processed increase must be recalculated, in order to award restitution of any amounts found to have been excessive.

In contrast, counsel represented to us that the rent schedule applicable to tenants in NCHA projects has not been revised upward since the disputed increase in 1970. By ordering only that future rent increases comply with the requirements of *Thompson I,* the District Court in the *Thompson* case appears to have left in effect a rent schedule which is the result of a defective decisionmaking process. In the *Thompson* case, therefore, we must decide not only whether reprocessing of rents charged in the past is necessary in order to allow restitution of any excess amounts paid, but also whether the current rent schedule must be reevaluated, using proper procedures for tenant participation, to ensure that tenants paying rents under that schedule will not be overcharged in the future.

In reviewing the decisions of the District Court in these cases, we are mindful of the broad latitude an equity court has in shaping relief. The District Court must be upheld if its actions are reasonable in light of all the circumstances involved. As the Supreme Court stated in *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("*Lemon II* "):

> In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. . . . Moreover, . . equitable remedies are a special blend of

---

**3.** The two groups of tenants apparently have been represented by the same attorney, at least since *Thompson I* and *Marshall I.*

what is necessary, what is fair, and what is workable. . . .

In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . .'

*Id.* at 200–01, 93 S.Ct. at 1469 (citations and footnotes omitted).

*Lemon I* (*Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)) had held unconstitutional, as a violation of the First Amendment's Establishment Clause, a state statute which provided for reimbursement of nonpublic sectarian schools for certain secular educational services. Upon remand, the District Court enjoined payment under this statute for any services performed after the date of the decision in *Lemon I,* but permitted reimbursement for services provided prior to that date. In *Lemon II,* the Court upheld the District Court's decree, emphasizing that the schools had incurred expenses in reliance on the statute and would suffer financial hardship if reimbursement were denied. 411 U.S. at 203–04, 93 S.Ct. 1463. The Court further noted that the schools' reliance was reasonable and in good faith, inasmuch as "*Lemon I* 'decid[ed] an issue of first impression whose resolution was not clearly foreshadowed,'"[4] and was reinforced by the fact that plaintiffs had not pressed for an injunction suspending payments during the pendency of *Lemon I. Id.* at 204–07, 93 S.Ct. 1463.

Since "[r]estitution is essentially an equitable remedy," *Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 158 U.S.App.D.C. 7, 485 F.2d 786, 825 (1973), *cert. denied,* 415 U.S.

935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), the general principles governing the shaping and review of equitable decrees are fully applicable to awards of restitution. This court has described the standards which should guide an equity court when a government agency has unlawfully authorized a rate increase by a regulated entity, as follows:[5]

Ordinarily . . . the proper disposition on setting aside a rate increase unlawfully ordered by the [agency] would be to compel the regulated company to restore the entire difference between the higher fares collected under the invalid order and the amount that it would have received from the fare schedule previously in effect. More fundamentally, however, our decision in this regard is to be governed by the equitable considerations which apply to suits for restitution generally. The basic question is whether "the money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it," and is "no longer whether the law would put him in possession of the money if the transaction were a new one." Since restitution is not a matter of right, but is "*ex gratia,* resting in the exercise of a sound discretion," it lies within our authority to direct restitution in an amount less than the whole sum of the increased fares collected under the invalid order, or to deny it altogether, if compelling equitable considerations so dictate.

Thus restitution is the appropriate remedy for illegal rate and rent increases unless compelling equitable considerations dictate otherwise.

*Transit Commission, supra* at 825. *Williams* involved a petition for direct review of an order by the Washington Metropolitan Area Transit Commission concluding that a particular rate of return on the D.C. Transit System's operating revenues was just and reasonable. Thus, in contrast to the instant cases in which we are merely providing appellate review of equity decrees entered by the trial courts, *Williams* required us to function as the equity court of first resort.

---

4. 411 U.S. at 206, 93 S.Ct. at 1472, *quoting Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

5. *Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 342, 415 F.2d 922, 944 (1968) (*en banc*), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), *quoting Atlantic Coast Line R. R. v. Florida,* 295 U.S. 301, 310, 55 S.Ct. 713, 79 L.Ed. 1451 (1935). *Accord, Democratic Central Committee v. Washington Metropolitan Area*

Applying the foregoing principles to the cases at hand, we conclude that in each case the District Court's decision not to order reprocessing of past rents, for the purpose of awarding restitution to tenants found to have been overcharged, was proper. We therefore affirm the judgment of the District Court in No. 75–1910, *Marshall v. Harris.* In No. 75–1789, *Thompson v. Washington,* we reach the same conclusion with respect to recalculation and restitution, but we also conclude that the District Court's decision to leave an invalidly derived rent schedule in effect for the indefinite future was not justified by the record before it. Consequently, we reverse in part the District Court's judgment in that case, and remand for further proceedings not inconsistent with this opinion. Our reasoning in each case is set out in greater detail below.

## II

*No. 75–1910, Marshall v. Harris*

After finding that the Linda Pollin Memorial Housing Project does receive a federal subsidy in the form of below-market-interest-rate loans, the District Court nevertheless concluded that "retroactive application of the tenants' procedural rights in this case would be unjust and inappropriate by reason of the financial difficulties currently being experienced by the . . . Project," and declined to order reevaluation and possible restitution of rent increases since August 1970. *Marshall v. Lynn,* Civil No. 2288–70, *supra.*

The Court's conclusion was amply supported by evidence in the record. An affidavit submitted by the Area Director of the District of Columbia Area Office of HUD stated his belief that reprocessing of rents, with restitution of any excess charges, would aggravate the already serious financial problems of the Project, and would therefore not be in the best interests of either the tenants or HUD:

    b.  The costs incurred by the nonprofit mortgagor in providing these tenants with notice and an opportunity to submit written comments concerning the 1970 application, [sic] would have

to be absorbed by project funds and would add to the deteriorating financial condition of the project. As it now exists, the project is unable to establish an effective maintenance and repair program without the benefit of financial arrangements that have increased its financial deficit. The siphoning off of additional funds to provide for tenant participation for the review of an application almost five years old, [sic] would not appear to be in the present tenants' interest or in the interest of HUD.

    c.  HUD might determine that the amount of the 1970 rent increase was not fully justified at that time and the Court might order a refund. The monies needed to provide the refund would have to come from project revenues or future rentals, as would the monies needed to trace qualified tenants to provide them with the refund. The administrative costs of providing these refunds would outweigh any financial benefit that these tenants might derive. Furthermore, a further drain of project revenue resulting from a refund would probably lead to foreclosure action by HUD to protect its security interest in the project.

Affidavit of Harry W. Staller, Brief and Appendix for Government Appellees at 21.

In addition, an affidavit filed on behalf of the Linda Pollin Corporation summarized the Corporation's financial statements for fiscal years 1971 through 1974 and characterized them as "reveal[ing] a progressively worsening financial situation" in which steadily rising costs have resulted in substantial losses in every year of the Project's operation. Affidavit of Conrad N. Angel, Brief and Appendix for Government Appellees at 16. The affidavit also noted that, despite the rent increases authorized by HUD, rental income from the Project has been insufficient to meet the operating and maintenance costs of the Project. *Id.* The tenants did not contest or refute the accuracy of any of the information contained in

these affidavits, and proffered no proof likely to establish that the 1970 rent increase resulted in rental levels which were excessive under the circumstances.

As in *Lemon II*, the tenants' failure to exhaust all avenues for relief pending appeal undercuts the equities of their position, and reinforces the reliance interests of the Pollin Corporation. The tenants did not seek a stay of the District Court's order disbursing the escrow account, and the funds were subsequently used to pay operating and maintenance expenses at the Pollin Project. Brief for Linda Pollin Corporation at 4; *see* Affidavit of Conrad N. Angel, *supra.* Certainly it does not offend "equity and good conscience" to withhold restitution of monies already spent on the tenants' behalf by a non-profit landlord brought into being at the urging of the Government for the advancement of the public interest in adequate housing.

Tenants might argue that, given the decision in *McKinney v. Washington, supra,* that the similar claim of the tenants in the *Thompson* case was unlikely to prevail on the merits, application for a stay pending appeal would probably have been futile. However, rather than putting the Linda Pollin Corporation on notice immediately after the escrow account was disbursed, or even at the first status call following remand from our decision in *Marshall I*, tenants' counsel waited until January 29, 1975 to inform the District Court that the tenants intended to seek restitution of all or part of the 1970 rent increase. Indeed, the holding in *McKinney* illustrates the reasonableness of the Pollin Corporation's reliance on the validity of the rent increase; like *Lemon I*, *Marshall I* "decided an issue of first impression whose resolution was not clearly foreshadowed." *See* note 4 and accompanying text, *supra.*

On the record before us, we have no warrant for disturbing, as deficient either in reason or equity, the District Court's decision not to order reprocessing or restitution of past rents. Since the rent schedule currently in effect at the Pollin Project was processed with an opportunity for full tenant participation, and the only issue before us is the scope of the relief ordered with respect to past rents, the judgment of the District Court in No. 75–1910, *Marshall v. Harris*, is affirmed in all respects.

### III

*No. 75–1789, Thompson v. Washington*

Our task in reviewing the District Court's decision in this case is made more difficult by the District Court's failure to specify its grounds for refusing to award any relief from the 1970 rent increase. The District Judge, in an unreported order, merely stated the following:

> Upon consideration of Plaintiffs' Motion for Summary Judgment and Defendant's Motion to Dismiss, . . . it appear[s] to the Court that Plaintiffs are entitled to prospective relief only . . ..

*Thompson v. Washington*, Civil No. 3000–69, *supra.* Nevertheless, with regard to the reprocessing and possible restitution of past rents, the considerations which motivated the District Court are apparent from the face of the papers filed in support of the tenants' motion for summary judgment and the opposing motion to dismiss.

The tenants' motion sought restitution under the principles set out in *Williams v. Washington Metropolitan Area Transit Commission* and *Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* discussed above in Part I. In response, the officials of NCHA argued that "retroactive" relief [6] from a

---

6. Appellees framed their argument in terms of retroactivity analysis, quoting at length from the Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). However, as the Court recognized in *Lemon II*, 411 U.S. at 199–200, 93 S.Ct. 1463, determining the proper scope of an equitable decree is a distinct problem from the

question, raised in the retroactivity cases, of whether a new holding should be applied in *other* cases which in relevant aspects began before the new rule of law was announced. Even so, the Court in *Lemon II* noted that the guidelines established in the retroactivity cases are helpful in reviewing the retrospective reach of an injunctive decree, *id.,* and proceeded to

procedurally defective rent schedule was not warranted in this case, since *Thompson I* decided an issue of first impression, and recalculation and restitution of past rents would be far more inequitable to NCHA than would denial of these remedies to the tenants. As to the balance of equities, the housing authorities asserted in particular that (1) recomputation of rents would be virtually impossible since many tenants had moved out of NCHA housing subsequent to the rent increase, and accurate data on which to compute rents was no longer available; (2) the rent increases had not been set aside in a fund which could be used to supply restitution, and NCHA is hard-pressed to meet operating and maintenance expenses and does not have contingency or other funds with which to make retroactive payments to tenants; and (3) the rent schedule was, in any event, only procedurally invalid, and did not necessarily result in excessive rental charges. Moreover, contended appellees, the hardship suffered by the tenants was slight, because in December 1969 Congress enacted the so-called Brooke Amendment to the United States Housing Act, effective ninety days thereafter, providing that rents for public low-rent housing may not exceed one-fourth of any family's income. Pub.L. 91–152, Sec. 213, 83 Stat. 389 (1969), *now codified at* 42 U.S.C. § 1402(1) (1970).

We think these factors formed a reasonable basis for denying the tenants' request for reprocessing and restitution of past rents. The tenants did not serve notice that they would seek restitution until January 22, 1975, at a calendar call in the District Court upon remand from *Thompson I,* and thus appellees neither set aside funds resulting from the rent increase nor collected data from tenants to facilitate reprocessing of the rent schedule. The holding in *Thompson I* was no more clearly foreshadowed than the holding in *Marshall I,* and hence appellees' reliance upon the previous state of the law was no more unreasonable here.

Perhaps most importantly, the administrative costs of reconstructing past events, and the restitution which might result, would have to come out of an NCHA budget which is already severely strained. Our opinion in *Thompson I* documented the critical financial deterioration which beset NCHA in the years preceding the 1970 rent increase, and which we characterized as a prime example of "the current financial crisis generally affecting public housing." *See* 497 F.2d at 629–30. By October of 1969, NCHA's reserve funds had been completely exhausted by operating deficits, and the rent increase was made in order to satisfy HUD's demand that NCHA devise a rent schedule which would generate sufficient income to assure NCHA's financial stability. Earlier in the year, HUD had rejected NCHA's budget proposal since projected operating and maintenance costs exceeded projected income.

In these circumstances, reprocessing and restitution of past rents might well in fact redound to the disadvantage of tenants currently living in NCHA housing. Although tenants' counsel asserts that alternative sources of funds for NCHA existed, and the rent increase was therefore unnecessary, he has alleged no facts to justify this claim. Moreover, while we would not concede that the Brooke Amendment has eliminated all hardship to tenants, it certainly weakens the equities in favor of restitution.

We are unable, however, to find sufficient support in the record to justify the District Court's refusal to order a forward-looking reevaluation of the rent schedule which went into effect in 1970, in light of current conditions and with allowance for the tenant participation contemplated by *Thompson I,* to ensure that current rents and rents paid in the foreseeable future are not excessive. The administrative costs of reprocessing current rents would appear to

---

examine the balance of equities, and, more particularly, the degree of reliance by the defendants and the extent to which the holding of *Lemon I* was foreshadowed, *see id.* at 201–03,

206, 93 S.Ct. 1463. Thus, appellees' doctrinal imprecision in no way undermines the validity of the factors which they relied upon in their motion to the District Court.

be much lower than for recalculating past rents, since present tenants could be more easily notified and current data should be more readily accessible. And, of course, installment of a revised rent schedule for the future would not entail burdensome refunds of past receipts out of NCHA's current budget.

One ground that might justify avoidance of even the relatively moderate administrative costs involved in reprocessing the current rent schedule would be a showing that such a reevaluation would be futile. The disputed rent schedule sets rent primarily on the basis of family income and family size, instead of fixing absolute dollar amounts for each rental unit. But appellants' counsel concedes that the current rent for most, if not all, of the tenants is effectively determined by the Brooke Amendment and not by the current rent schedule, since unmodified application of that schedule would result in rents exceeding 25% of family income.[7] Obviously, if the rent for all tenants would be effectively determined by the Brooke Amendment even if the pre-1970 rent schedule were reinstated—*i. e.,* if application of the pre-1970 schedule, without regard to the Brooke Amendment, would result in rental levels for all tenants greater than 25% of their income—then reprocessing of the 1970 rent increase would be a totally academic exercise. On the other hand, if it is possible that a validly determined rent schedule would result in rents which are less than 25% of some tenants' incomes, then reprocessing would not be futile solely on account of the Brooke Amendment.

Assuming for the sake of argument that the Brooke Amendment would not make reevaluation of the current rent schedule futile, only a showing that the current schedule almost certainly does not result in excessive rents would be sufficient to justify leaving that invalidly processed schedule in effect.[8] Notwithstanding our recognition of the difficult financial problems confronting NCHA, this court held in *Thompson I* that tenants have, to the degree and in the manner indicated in that opinion, a right to participate in the decisionmaking process leading up to a rent increase. Although the current rent schedule implicates greater reliance interests than would future rent increases, we must be careful not to give short shrift to the functional rationale underlying *Thompson I,* that is to say, the possibility that tenants will bring relevant information to bear on the propriety of a particular rent level. *See* 497 F.2d at 638–39.

We therefore affirm the District Court's decision to deny reprocessing and possible restitution of past rents, but remand for further consideration of the propriety of ordering a reevaluation of the rent schedule currently in effect.

The judgment of the District Court in No. 75–1789, *Thompson v. Washington,* is affirmed in part and reversed in part, and is remanded for proceedings not inconsistent with this opinion.

The judgment of the District Court in No. 75–1910, *Marshall v. Harris,* is affirmed.

*It is so ordered.*

---

7. The effective ceiling created by the Brooke Amendment may explain why no upward revision in the rent schedule has been sought since 1970. Of course, for tenants who pay less than 25% of their income, the disputed schedule has a built-in adjustment for inflation to the extent that inflated family incomes increase the amount of rent due.

8. We have assumed throughout the accuracy of counsel's representation that the 1970 rent schedule, as modified by the terms of the Brooke Amendment, is still in effect. If that schedule has in fact been superseded by a schedule processed under the standards for tenant participation set out in *Thompson I* or in HUD's regulations implementing that decision, then reevaluation of the current rent schedule of course would not be required under our reasoning.