**FREDERICK COUNTY FRUIT GROWERS ASSOCIATION, INC., et al., Appellants,**

v.

**Lynn MARTIN, Secretary of Labor, et al., Appellees.**

No. 91–5069.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1991.

Decided July 7, 1992.

Thomas E. Wilson, with whom Ronald A. Lindsay and Christopher A. Weals were on the brief, for appellants.

Edward J. Tuddenham, with whom Shelley Davis, Susan M. Sacks, and Garry G. Geffert were on the brief, for appellee Cedrick Turner, et al.

Judry L. Subar, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Michael J. Singer, Atty., DOJ, and Harry L. Sheinfeld, Atty., Dept. of Labor, were on the brief, for federal appellees.

Before MIKVA, Chief Judge, EDWARDS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Associations representing fruit growers in several eastern states filed suit, on behalf of themselves and their members, challenging the Secretary of Labor's interpretation of the regulation establishing the minimum wage for foreign agricultural (H–2) workers. A class of such workers intervened and counter-claimed for unpaid wages for the 1983 through 1985 harvests. Relying upon an earlier court decision interpreting the minimum wage regulation (in a case to which the growers were not parties), the district court precluded the growers from relitigating the meaning of the regulation. The district court also granted the workers' claim for unpaid wages for the 1983 and 1985 harvests and denied the workers' claim for the 1984 harvest. Although we follow a line of reasoning different in some respects from that of the district court, we uphold its judgment in all respects.

## I. BACKGROUND

The H–2 program enables a U.S. employer to hire foreign agricultural workers for seasonal work. 8 U.S.C. § 1101(a)(15)(H)(ii) (1982) (amended and renamed "H–2A" after the events at issue here, see 8 U.S.C. § 1101(a)(15)(H)(ii)(a)). In order to hire H–2 workers, an employer must submit to the Secretary of Labor a "job clearance order" in which the employer promises to pay its H–2 workers at least the hourly "adverse effect wage rate" (AEWR)—an amount set by the Secretary in order to ensure that the H–2 program does not adversely affect "the wages of similarly employed U.S. workers," 20 C.F.R. § 655.200(b) (1983) (current version at 20 C.F.R. § 655.200(c)). An employer that pays its workers by the piece rather than by the hour must establish a piece rate that allows a worker of average productivity to earn the AEWR. See id. § 655.202(b)(9)(ii) (amended 1987).

When the Secretary increases the AEWR, an employer that pays by the piece has two options: either increase the piece rate or increase the productivity of its average worker. In response to claims that

employers were demanding greater output per worker hour, *see* 43 Fed.Reg. 10306, 10309 (1978), which would have a correspondingly "adverse effect" upon domestic agricultural workers, in 1978 the Secretary promulgated the following regulation:

> In any year in which the applicable [AEWR] is increased, employers shall adjust their piece rates upward to avoid requiring a worker to increase his or her productivity over the previous year in order to earn an amount equal to what the worker would earn if the worker were paid at the [AEWR].

*Id.* at 10317 (codified at 20 C.F.R. § 655.-207(c); repealed 1987). In 1981, the Secretary interpreted the 1978 regulation to mean that when the Secretary increases the AEWR, an employer is required to increase its piece rate only if, based upon the previous year's productivity and piece rate, the employer's average worker would not otherwise earn the new AEWR.

When workers challenged this interpretation, Judge Richey held that the "average worker interpretation" was improper and ordered the Secretary to adopt a "proportional increase interpretation" of the 1978 regulation. Under that interpretation, whenever the Secretary increases the AEWR all employers must increase their piece rates by the same proportion. *NAACP v. Donovan,* 558 F.Supp. 218 (D.D.C.1982) (*NAACP I*); *NAACP v. Donovan,* 566 F.Supp. 1202 (D.D.C.1983) (*NAACP II*).

The Secretary did not appeal *NAACP II,* opting instead to pursue the average worker policy by adopting a new rule to that effect. *See* 48 Fed.Reg. 33684, 33687 (1983) (notice of proposed rule). Until the Secretary issued a valid new rule, however, he was bound by *NAACP II* to require that growers pay their H–2 workers the piece rate calculated according to the proportional increase interpretation of the 1978 regulation. The growers, fearing that the Secretary would not promulgate a new rule before the start of the approaching 1983 harvest, sought and obtained a court order compelling him to issue a new rule by September 1 of that year. *Kent Barley,*

*Inc. v. Donovan,* No. 83–0079 (W.D.Va. Aug. 18, 1983).

On September 2, the Secretary issued a new rule that codified the average worker interpretation of the 1978 regulation. 48 Fed.Reg. 40168, 40175. Representatives of the workers immediately filed suit to challenge the new regulation, and on September 8 Judge Richey preliminarily enjoined its enforcement. *NAACP v. Donovan,* No. 82–2315 (D.D.C.1983). Thus, throughout the 1983 harvest (except for the week of September 2–8) the Secretary was under court order to require the growers to pay their H–2 workers the piece rate calculated according to the 1978 regulation. The growers nonetheless paid only the lower piece rate calculated according to the 1983 regulation.

On appeal we vacated Judge Richey's preliminary injunction prior to the 1984 harvest, but we did not reach the merits of the workers' challenge to the 1983 regulation. *NAACP v. Donovan,* 737 F.2d 67 (D.C.Cir.1984) (*NAACP III*). During the 1984 harvest, therefore, the Secretary applied the 1983 regulation, and the growers again paid their H–2 workers the piece rate calculated upon that basis.

On July 9, 1985 we did reach the merits of the workers' challenge, and we set aside the 1983 regulation because the Secretary had not adequately explained his reason for adopting it. *NAACP v. Donovan,* 765 F.2d 1178, 1185 (D.C.Cir.1985) (*NAACP IV*). That decision in effect reinstated the 1978 regulation. Accordingly, the Secretary required the growers to include in their job clearance orders for the 1985 harvest a promise to pay their workers the higher piece rate. In addition, he refused to accept job orders in which the growers purported to reserve their right to challenge his calculation of the piece rate. The growers complied but also filed separate letters of protest with the Secretary. In violation of their job clearance orders, moreover, the growers again paid their H–2 workers only the lower piece rate calculated according to the 1983 regulation.

In September 1985 the growers filed the present action challenging the Secretary's

court-ordered (i.e. proportional increase) interpretation of the 1978 regulation. The workers counterclaimed for the difference between what they were paid (under the invalid 1983 regulation) and what they claim they are entitled to (under the 1978 regulation) for the harvests from 1983 through 1985.

The district court noted that the meaning of the 1978 regulation had been fully litigated in *NAACP II* (to which the growers had not been parties) and precluded the growers from relitigating that issue. *Frederick County Fruit Growers Ass'n v. McLaughlin*, 703 F.Supp. 1021, 1026–28 (D.D.C.1989) (*FCFGA I*). The district court granted the workers' claim for backpay for the 1983 harvest (except for the period September 2–8) as a matter of "equitable restitution," *id.* at 1029, denied the workers' claim for the 1984 harvest because the growers had reasonably relied upon the validity of the 1983 regulation, *id.*, and granted the workers' claim for the 1985 harvest as a matter of contract, *id.* at 1030–31. The district court subsequently added interest to the backpay awards. *Frederick County Fruit Growers Ass'n v. Dole*, 709 F.Supp. 242, 247 (1989) (*FCFGA II*).

When the Supreme Court held in *Martin v. Wilks*, 490 U.S. 755, 765, 109 S.Ct. 2180, 2186, 104 L.Ed.2d 835 (1989), that "[j]oinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree," the growers moved for reconsideration of the district court's order precluding them from relitigating the issue decided in their absence in *NAACP II*. The district court denied reconsideration on two grounds: First, in *Martin v. Wilks* the plaintiffs challenged a consent decree, whereas in this case the growers challenge a judgment of the court reached after "vigorous litigation"; and second, *Martin v. Wilks* involved "private rights" whereas this dispute involves "public rights." *Frederick County Fruit Growers Ass'n v. Dole*, 758 F.Supp. 17, 20 (D.D.C.1991) (*FCFGA III*).

The district court also noted in *FCFGA III* that subsequent events had mooted the growers' prospective challenge to the Secretary's interpretation of the 1978 regulation. *Id.* at 21 n. 3. In 1987 the Secretary repealed that regulation, 52 Fed.Reg. 11460, 11466, and promulgated a new piece rate regulation, 52 Fed.Reg. 20496, 20521 (codified at 20 C.F.R. § 655.102(b)(9)(ii)), which we upheld in *AFL–CIO v. Dole*, 884 F.2d 597 (D.C.Cir.1989).

On appeal the growers argue that the district court erred first in awarding the workers backpay for the 1983 and the 1985 harvests and then again in calculating the interest due on those awards. The workers do not cross-appeal the district court's denial of their backpay claim for the 1984 harvest. For ease of exposition, we begin with the 1985 backpay award.

## II. THE 1985 HARVEST

■ Recall that the Secretary required each grower to include in its job clearance order for the 1985 harvest a promise to pay its H–2 workers the higher piece rate, calculated according to the district court's interpretation of the 1978 regulation in *NAACP II*. Each grower's promise in the job clearance order created a contractual obligation running from that grower to each of its workers. The appropriate remedy for the growers' breach of that contractual obligation is backpay, and the district court so held. *FCFGA I*, 703 F.Supp. at 1030–31.

The growers' lone defense to contract liability for the 1985 harvest is that they promised to pay the higher piece rate only because the Secretary required them to do so, and "[t]he sole predicate for [the Secretary's] action was the district court's injunction[ ] in *NAACP [II]*." The growers seem to be arguing that if only the district court had not improperly precluded them from relitigating the issue decided in *NAACP II*, and they had been able to show that that decision was wrongly decided, then they would be discharged from their promise to pay the higher piece rate.

Even assuming, however, that *NAACP II* is wrongly decided and that the Secretary was therefore mistaken in requiring the growers to agree to pay the higher piece rate for the 1985 harvest, the fact remains that the growers did promise to do so. The growers do not argue on appeal that their promise was made under duress. Nor do the growers argue that by filing letters of protest with the Secretary they conditioned performance of their promise upon losing a court challenge to *NAACP II* on the merits, or that they otherwise preserved their right to challenge in court the obligation they freely undertook. In short, the growers fail to assert any ground that might excuse non-performance of their contract; therefore they remain bound by their voluntary and unconditional promise to pay the workers the higher piece rate for 1985. *Cf. Ballay v. Legg Mason Wood Walker, Inc.,* 878 F.2d 729, 734 (3d Cir.1989) (private contract term required by agency rule remains enforceable after rule rescinded). Thus, we affirm the award of backpay for the 1985 harvest regardless of whether the growers are entitled to relitigate the meaning of the 1978 regulation.

### III. THE 1983 HARVEST

The district court awarded backpay to the workers for the 1983 harvest based not upon contract law but upon the principle of equitable restitution. According to the district court, the workers are entitled to restitution because the 1983 regulation, which permitted the growers to pay the lower piece rate, was subsequently held invalid in *NAACP IV;* as a result, the growers paid the workers less than they were obliged by law to pay, i.e., under the 1978 regulation as interpreted in *NAACP II. FCFGA I,* 703 F.Supp. at 1028–29. The growers argue that the backpay award for the 1983 harvest should be set aside because the district court improperly precluded them from showing that the court erred in interpreting the 1978 regulation in *NAACP II.* In the alternative, the growers argue that the district court erred or abused its discretion in awarding restitution to the workers.

### A. *Issue Preclusion*

The growers claim that under the teaching of the Supreme Court in *Martin v. Wilks,* they are entitled to relitigate the issue decided in *NAACP II.* Several years before the plaintiffs in that case filed suit, the NAACP and individual blacks had sued the city of Birmingham, Alabama, alleging that the fire department discriminated on the basis of race in its hiring and promotion practices. The parties to that earlier case had entered into a settlement agreement that provided, among other things, that the fire department would prefer minority applicants for employment and minority candidates for promotion. The district court then entered a consent decree embodying the settlement. Soon thereafter a group of white fire fighters (the plaintiffs in *Martin v. Wilks* ) sued the city, alleging that it was discriminating against them by making promotion decisions on the basis of race. The city admitted that its promotion decisions were not color-blind but defended its practice on the ground that it was merely complying with the consent decree entered in the previous case. The city also argued that because the white fire fighters had been aware of the previous action and had chosen not to intervene, they should not be allowed to challenge the consent decree after the fact.

The Supreme Court disagreed. Invoking the "deep-rooted historic tradition that everyone should have his own day in court," 490 U.S. at 762, 109 S.Ct. at 2184, quoting 18 Charles Alan Wright, Arthur Miller, & Edward Cooper, *Federal Practice and Procedure* § 4449, at 417 (1981), the Court concluded that the white fire fighters must be given an opportunity to press their discrimination claim. "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene," said the Court, "is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree." *Id.* at 765, 109 S.Ct. at 2186. Although *Martin v. Wilks,* no longer applies on its own facts, *see* Civil Rights Act of 1991, § 108, 42 U.S.C. § 2000e–2(n) (governing "claim[s] of employment discrimina-

tion under the Constitution or Federal civil rights laws"), it stands as an affirmation of the general principle that a judgment rendered by a federal court binds not a non-party.

The district court nevertheless held that the growers are not entitled to relitigate the issue decided in *NAACP II.* As a threshold matter, the district court stated that even if the growers were successful in such a challenge, they would still be liable for backpay. According to the court, the backpay award was "made independently of the collateral estoppel effect of the previous *NAACP* litigation, and the *Martin* decision simply does not undermine, or even implicate, these back-wage rulings." *FCFGA III,* 758 F.Supp. at 21. What the court meant is not entirely clear. All agree that the growers' liability for backpay for the 1983 harvest is rooted in equity. If the growers were successfully to challenge the *NAACP II* ruling—and thereby to establish that the piece rate that they actually paid their H–2 workers in 1983 was the lawful minimum wage—then a court could hardly find an equitable basis for awarding the workers any additional pay.

Alternatively, the district court distinguished *Martin v. Wilks* on two grounds: First, "*Martin* involved a collateral attack on a consent decree whereas here the Growers are trying to overturn a final court order granting declaratory and injunctive relief despite [the Secretary's] vigorous litigation efforts." *Id.* at 20 (emphasis omitted). That the previous case had been concluded by a consent decree, however, was in no way significant to the Court's reasoning in *Martin v. Wilks. See* 490 U.S. at 765, 109 S.Ct. at 2186 (one must be joined as a party to be "bound by a judgment or decree"). Second, the district court stated that *Martin v. Wilks* involved only "private rights," whereas this is a "public rights" case. *FCFGA III,* 758 F.Supp. at 20. Whatever the precise content of that dichotomy, again there is nothing in *Martin v. Wilks* to suggest that it is relevant; indeed it is not even clear that *Martin v. Wilks* is any more a case of "private rights" than is the present case.

In defense of the result, if not the reasoning, of the district court, the workers point out that in a footnote the Supreme Court recognized an exception to the rule in *Martin v. Wilks:* a non-party may be bound by a judgment "when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." 490 U.S. at 762 n. 2, 109 S.Ct. at 2184 n. 2. In order to make the exception applicable here, the workers argue that the growers' interests were adequately represented in *NAACP II* by the Secretary.

In *NAACP II* the Secretary did initially defend the interpretation of the 1978 regulation that the growers now seek an opportunity to advance for themselves. After he lost in the district court, however, the Secretary decided not to appeal; rather, in order to pursue his interest in regulating future conduct, he decided to issue a new rule. The growers were concerned in part about the minimum wage rate that would apply in the interim before a new rule could become final; thus, the growers had an interest in pursuing an appeal that the Secretary did not in the end "adequately represent." *Cf. United Airlines v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977) (permitting post-judgment intervention by interested party for the purpose of taking appeal). Therefore, the rule in *Martin v. Wilks,* and not the exception, applies here.

The rule in *Martin v. Wilks* does not necessarily entitle the growers to relitigate the issue decided in *NAACP II,* however. As the growers recognize, the principle behind *Martin v. Wilks* is not that any person may attack a final judgment with which he or she simply disagrees. Nor does that case state that a non-party may never be adversely affected by a judgment. Rather, *Martin v. Wilks* stands for a more modest proposition: One may challenge a judgment rendered in one's absence if (and only if) it affects one's legal right—in that case the right to be considered for promotion free of racial discrimination. *See Martin v. Wilks,* 490 U.S. at 763, 109 S.Ct. at 2185 ("Unless duly summoned to appear in a

legal proceeding, a person ... may rest assured that a judgment recovered therein will not affect his legal rights") (quoting *Chase National Bank v. Norwalk*, 291 U.S. 431, 441, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934)); *United States v. Ettrick Wood Prods.*, 916 F.2d 1211, 1219 (7th Cir.1990) (per curiam) ("litigation does not alter the rights of non-parties," citing *Martin v. Wilks*); *United States v. International Bhd. of Teamsters*, 905 F.2d 610, 623 (2d Cir.1990) (union member who failed to allege that consent decree entered into by union harmed any of his "independent right[s]" may not challenge it).

Therefore, in order to relitigate the meaning of the 1978 regulation, the growers must show that the Secretary, by changing her interpretation of the 1978 regulation in compliance with the judgment in *NAACP II*, infringed upon their legal right. The growers assert three "interests" that they claim were harmed by the decision in *NAACP II*.

First, the growers point to the financial harm they suffered because the court required that the Secretary order the growers to pay higher wages to their H-2 workers. It does not follow, however, that any legal right of the growers was affected. If the Secretary had changed her interpretation of the 1978 regulation on her own, then the resulting financial harm to the growers would not by itself entitle them to judicial relief; they would have to show also that there was a procedural or substantive (i.e., a legal) defect in the Secretary's changed position. No less is required just because the Secretary acted pursuant to a court order.

Second, the growers argue that *NAACP II* was decided upon the basis of incorrect factual information, and that the court would have been apprised of the true facts if the growers had been parties—or by extension, if they are now allowed to relitigate the issue. Assuming that to be true, however, it would still not establish any harm to a legal right of the growers. One has no legal right to the correct resolution of a dispute between strangers.

Third, the growers cite *United States v. South Florida Water Management Dist.*, 922 F.2d 704 (11th Cir.1991), for the proposition that, because the district court in *NAACP II* in effect wrote a new regulation, the Administrative Procedure Act, 5 U.S.C. § 553(c), gives them a legal right to participate in that "rulemaking" process. *South Florida* is not analogous to this case, however. In *South Florida* the farmers had a state law right to participate in the proceedings of a state agency. When the agency delayed in establishing a water quality standard, the United States sought to set the standard through a judicial proceeding. That would effectively have precluded a subsequent agency proceeding, so that if the farmers had not been allowed to intervene in court, then their right to participate in standard-setting would have been lost irretrievably. In contrast, *NAACP II* was a challenge to the Secretary's interpretation of his own regulation; it followed a rulemaking proceeding (in 1978) in which the growers had the right to participate, and nothing in *NAACP II* precluded the Secretary from convening a new rulemaking on the same subject in which the growers would have a right to participate (as the Secretary did in fact do in 1983 and again in 1987). The growers' assertion to the contrary notwithstanding, therefore, *NAACP II* was neither the functional equivalent of, nor a bar to, a notice and comment rulemaking proceeding. Consequently, deciding *NAACP II* in the growers' absence did not in any way infringe upon their APA right to participate in rulemaking.

Finally, we note that the growers do not argue on appeal that the Secretary's (court-ordered) interpretation of the 1978 regulation is arbitrary and capricious. Therefore, we express no opinion about any possible tension between *Martin v. Wilks*, which might require that the growers be given an opportunity to establish that the Secretary is denying them their legal right to an interpretation of the 1978 regulation that is not arbitrary and capricious, and *GTE Sylvania v. Consumers Union*, 445 U.S. 375, 386–87, 100 S.Ct. 1194, 1201–02, 63 L.Ed.2d 467 (1980), which suggests that the Secre-

tary's compliance with a court order would be a complete defense to such a claim.

We conclude that *Martin v. Wilks* governs this case, but the growers have not established that the district court order in *NAACP II* infringes upon any legal right of theirs. As a result, the growers are not entitled to relitigate the issue resolved in that case. We turn next to the growers' alternative arguments that the district court erred in awarding restitution to the workers for the 1983 harvest.

## B. Restitution

The district court analyzed the remedial aspect of this case much as it would a successful court challenge to a rate increase that had been duly implemented by a regulated carrier after approval by a regulatory agency. "[E]quitable restitution" is the proper remedy, the district court said, "when funds have been either paid or withheld pursuant to an invalid administrative edict." *FCFGA I*, 703 F.Supp. at 1029; *see also Atlantic Coast Line R.R. Co. v. Florida*, 295 U.S. 301, 309, 55 S.Ct. 713, 716, 79 L.Ed. 1451 (1935); *Democratic Central Comm. v. Washington Metropolitan Area Transit Comm'n*, 485 F.2d 786, 824 (D.C.Cir.1973) (*DCC*); *Williams v. Washington Metropolitan Area Transit Comm'n*, 415 F.2d 922, 942 n. 97 (D.C.Cir.1968) (en banc). We think the district court might more aptly have approached the remedial question as it would a problem of quasi-contract: The wage term in the 1983 contract between the growers and the workers was unenforceable; therefore, the court must supply a reasonable wage term; in the context of this case the reasonable wage is the minimum wage established by the Secretary; and the growers should be ordered to pay that amount (less what they paid the workers voluntarily). The workers do not make this argument, however, and so we do not consider it. Because neither the workers nor the growers challenge the district court's analogy to a rate case, we analyze the parties' arguments within that rubric.

■ In fashioning a remedy based upon equitable restitution, "the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." *Thompson v. Washington*, 551 F.2d 1316, 1318 (D.C.Cir.1977) (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973)). Despite (or perhaps because) the district court is so broadly empowered, the growers raise no fewer than six distinct arguments challenging its award of back pay.

■ *First.* The growers argue that "[t]he purpose of restitution is to restore a person 'to the position he formerly occupied either by the return of something he previously had or the receipt of its equivalent in money,'" quoting Restatement of Restitution § 1, comm. a (1937). Viewed in this light, the workers are not entitled to restitution because they "never possessed the disputed wages."

Restitution is not so limited a remedy, however. Courts regularly award as restitution reasonable compensation for services rendered. *See* Dan B. Dobbs, *The Law of Remedies* § 4.4, at 259 (1973); *see also* Restatement § 1, comm. b (noting that "a physician [who] attends an insensible person" may be entitled to "restitution"); Dobbs § 4.1, at 222 (restitution not limited to "restoration ... of property or money taken from the plaintiff"). Indeed, this court has previously awarded restitution when an employer failed to pay the lawful minimum wage. *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 955 (D.C.Cir.1958); *cf. Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974) ("In Title VII cases the courts of appeals have characterized backpay as ... a form of restitution"). Perhaps, as one commentator has remarked, the term "restitution" is "not wholly apt" insofar as a defendant may be required to give to a claimant "something [the claimant] did not have before." 1 George E. Palmer, *The Law of Restitution* § 1.1, at 4 (1978). Be that as it may, under the established law of this circuit, it is no bar to their claim for restitution that the workers "never possessed the disputed wages."

*Second.* The growers assert that the workers are not entitled to restitution be-

cause restitution is generally not available to one who "voluntarily" confers a benefit upon another, Restatement § 112; Dobbs § 4.9, and the workers' employment was of course voluntary. In the context of restitution, however, it seems that voluntariness is a somewhat specialized concept; a court will deny restitution for a voluntary transaction only if the claimant confers the disputed benefit "with an intention to make a gift" or "without affording [the recipient] the opportunity to reject the benefit." *Id.* § 4.9, at 299; *see also* Restatement § 2; 2 Palmer § 10.1, at 359. Here the workers obviously did not perform their labor at a reduced rate because they intended to confer a gift upon the growers—who are not so brazen as to claim otherwise—and the growers had ample opportunity to reject the fruits of the workers' labor. Thus, although they entered the employment relation with the growers voluntarily, the workers are not disqualified on that basis from receiving restitution. *See DCC*, 485 F.2d at 824–25 (granting restitution to bus riders for invalid fare increase); *Williams*, 415 F.2d at 942–43 (same).

*Third.* The growers claim that "it is doubtful that a claim for restitution can rest solely on the invalidation of a regulation" on a procedural, as opposed to a substantive, ground. We find no basis for the growers' doubt. In both *DCC* and *Williams* we invalidated on procedural grounds fare increases approved by the Metropolitan Transit Commission and we ordered the carrier to make restitution to the riders. *See DCC*, 485 F.2d at 824–25; *Williams*, 415 F.2d at 942–43. To do otherwise—to "permit [the carrier] to retain the increased fares"—we reasoned, "would be to give legal effect to the Commission's invalid order." *Id.* at 943.

*Fourth.* The growers argue that the workers should be denied restitution as a matter of equity: The growers claim that in underpaying their workers, they reasonably relied upon the 1983 regulation, and ordering restitution would "inflict substantial hardship" upon them. *See, e.g., Moss v. Civil Aeronautics Bd.*, 521 F.2d 298, 314 (D.C.Cir.1975); *Thompson*, 551 F.2d at 1322; *see also* Restatement § 142(1) ("The

right of a person to restitution ... is terminated or diminished if, after receipt of the benefit, circumstances have so changed that it would be inequitable to require the [recipient] to make full restitution"); Dobbs § 4.6, at 279 (restitution may be denied if recipient "has somehow relied substantially upon having the benefit, so that restoration works a serious hardship upon him"). But this argument fails for a simple reason: The growers did not reasonably rely upon the 1983 regulation during the 1983 harvest.

In the summer of 1983, when the growers made plans for the 1983 harvest and filed their job clearance orders to hire H–2 workers, there was at the least a significant possibility that the 1983 harvest would be governed by the 1978 regulation. On July 22 the Secretary issued a proposed "average worker" rule of the sort favored by the growers. 48 Fed.Reg. 33684, 33687. It was not until August 18, however, that the growers secured a court order requiring the Secretary to issue a new regulation by September 1, 1983, and that order specifically provided that it should not "be construed as ... in any way limiting the right of [the Secretary] to publish a final interpretive piece rate adjustment rule in accordance with [the Secretary's] own policies," *Kent Barley, Inc.*, slip op. at 2. Therefore, while the Secretary might have been more likely to adopt something like the rule he had proposed in July 1983 than something completely different, prior to September 2 the growers could not have reasonably relied upon the Secretary's adopting any particular regulation in his final rule decision. And by September 2, when the Secretary issued the rule upon which the growers now claim to have relied, the growers' plans for the harvest— including their decisions regarding how many workers to hire—were already complete; it was too late for the growers to change them in reliance upon the new regulation. Indeed, in some areas the harvest had already begun. *Cf. FCFGA I*, 703 F.Supp. at 1029 (denying restitution for 1984 harvest because of growers' reasonable reliance upon 1983 regulation); *Morri-*

*son v. United States Dep't of Labor*, 713 F.Supp. 664, 673 (S.D.N.Y.1989) (denying restitution for 1986 harvest because of growers' reasonable reliance upon regulation in effect throughout planning period and not challenged until late August).

Moreover, by September 8, when the district court enjoined the Secretary from implementing the 1983 regulation, the growers knew "full well that the [1983 regulation] was, if not flatly invalid, of at least dubious validity." *FCFGA I*, 703 F.Supp. at 1029. If the growers "relied" upon the 1983 regulation thereafter, then it was only in the sense that they calculated that they were better off to pay the lower wage and hope to prevail on appeal—figuring that prevailing on appeal would be a Pyrrhic victory if they had already paid the higher wage. But that was merely an attempt at self-help, not a case of reasonable reliance. *See Heckler v. Community Health Servs.*, 467 U.S. 51, 62, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984) (hospital that knowingly retained duplicative cost reimbursements must repay government despite hardship); Restatement § 142, comm. a (hardship defense may be invoked only by one "guilty of no greater fault than that of the claimant"); Dobbs § 4.6, at 280 (hardship that would relieve innocent defendant from liability for restitution no bar to restitution against wrongdoing defendant). In sum, because the 1983 regulation was promulgated on the eve of the 1983 harvest and was in effect for only six days in 1983— and the district court exempted these six days from the backpay period—it is clear that the growers are not being required to make restitution in respect of any period during which they reasonably relied upon the 1983 regulation.

*Fifth.* The growers argue that although the district court has broad discretion to award restitution, it "abused its discretion by relying on [an] erroneous factor[ ]." The growers here point to the district court's statement that they underpaid their workers "in direct violation of this Court's Order of September 8, 1983." *FCFGA I*, 703 F.Supp. 1029. Because they were not parties to the proceeding that gave rise to the September 8 order the growers, of course, could not have violated that order.

If the district court had really based its restitution order to any meaningful extent upon the ground that the growers had violated the September 8 order, then a remand might be necessary. *See In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 635 (D.C.Cir.1992). Considered in context, however, the errant remark appears to be but an imprecise phrase in a larger statement to the effect that, because the growers knew that the district court had enjoined enforcement of the 1983 regulation on September 8, they did not reasonably rely upon that regulation in underpaying their workers after that date. An unfortunate but isolated hyperbole in the course of making a valid point does not establish that the district court abused its discretion.

*Sixth.* The growers argue that even if restitution is an appropriate remedy, the district court abused its discretion by failing "to consider whether it should direct restitution in an amount less than the difference between" the amount due under the 1978 regulation and the amount actually paid. In *Williams* we stated the following general rule:

Ordinarily ... the proper disposition on setting aside a rate increase unlawfully ordered by the Commission [is] to compel the regulated company to restore the entire difference between the higher fares collected under the invalid order and the amount that it would have received from the fare schedule previously in effect.

415 F.2d at 944; *see also Mitchell*, 259 F.2d at 955 (awarding restitution for full amount wrongfully withheld from workers). Although less than full restitution is appropriate in certain circumstances, *see, e.g., Thompson*, 551 F.2d at 1319 (restitution of full amount "is the appropriate remedy ... unless compelling equitable considerations dictate otherwise"); *Williams*, 415 F.2d at 946 (awarding less than full restitution based upon claimants' concession that some fare increase would not have been unlawful), the growers point to no exceptional circumstance in this case. Thus, we

can hardly say that the district court abused its discretion by following the general rule and awarding the workers full restitution.

### C. Conclusion

The growers raise additional challenges to the district court's award of restitution, but they are either reformulations of the arguments discussed above or otherwise lack merit. We therefore reject the growers' challenges and affirm the award of full restitution to the workers for the 1983 harvest.

### IV. PREJUDGMENT INTEREST

■■■ There is no doubt that the district court may award prejudgment interest on funds that are to be paid over as restitution. *Bebchick v. Washington Metropolitan Transit Comm'n,* 645 F.2d 1086, 1093 (D.C.Cir.1981) (*Bebchick III* ). The decision whether to award interest is within the equitable discretion of the district court, *see id.;* Restatement § 156(c), and therefore subject to narrow appellate review. The growers argue nonetheless that the court erred in one respect or another in determining the amount of interest due on the 1983 and 1985 awards.

*1983.* In determining when interest begins to accrue, one factor for the district court to consider is the date upon which "the amount to be restored became relatively certain." *Bebchick III,* 645 F.2d at 1093. The district court held that "interest should begin to run on the delinquent 1983 back wages from the date those wages were improperly [with]held." *FCFGA II,* 709 F.Supp. at 247. The growers contend that this was error because the amount to be paid became fairly certain only as of the date of the *FCFGA II* decision (January 17, 1989).

The growers rely heavily upon *Bebchick III.* In that case we ordered a regulated bus company to place into a "riders' fund" excess fares that it had collected pursuant to an invalid order of the Metropolitan Transit Commission, together with interest. We held that the interest should accrue, however, not from the date that the fares were wrongfully collected but from the date of our earlier decision, *Bebchick v. Washington Metropolitan Transit Comm'n,* 485 F.2d 858 (D.C.Cir.1973) (*Bebchick II* ), requiring that the excess fares be paid into a riders' fund and remanding the matter to the Commission for further proceedings. *Bebchick III,* 645 F.2d at 1093.

The growers argue that, like the liability of the carrier in *Bebchick,* their liability became "relatively certain" only after a court first ordered restitution. In the *Bebchick* litigation, however, the defendant had no reason to believe before that court decision that it had wrongfully retained fares collected in excess of the lawful rate. Here, in contrast, the district court found that the growers had known they were underpaying their workers even as they did so. *FCFGA II,* 709 F.Supp. at 247. Based upon that finding, we perceive no error in providing that interest accrue as of the date that the workers were underpaid. *See Mitchell,* 259 F.2d at 956 (interest to accrue from date employer paid workers less than lawful minimum wage).

■■■ *1985.* Soon after the 1985 harvest, the district court for the Western District of Virginia ordered the growers to place the disputed funds into an interest-bearing account with the Department of Labor as trustee. *Frederick County Fruit Growers Ass'n v. Brock,* No. 85–0142–D, slip op. at 2–3 (W.D.Va. Dec. 17, 1985). In *FCFGA II,* the district court here held that the workers were entitled to "whatever rate of interest the ... funds have earned ..., so long as the net result ... is ... a rate not less than 9%." 709 F.Supp. at 247.

The growers argue that the district court's imposition of the 9% minimum rate of return was improper. Payment into an interest bearing account, they say, "stops the running of prejudgment interest." The growers' sole support for this assertion is that the payment of money into the court under Fed.R.Civ.P. 67 for deposit in an interest bearing account tolls the defendants' liability for prejudgment interest. *See* 12 Wright & Miller § 2991, at 51. The growers argue that "[t]here is no reason to

treat the funds in this case any differently," but they are wrong.

When funds are deposited with the court, the court undertakes to ensure an adequate rate of return. Here, in contrast, the growers unilaterally placed the funds into an interest-bearing account; if the growers were doubtful about recovering the disputed funds, they had little incentive to secure an adequate rate of return. Presumably in order to protect the workers from the possibility of such desultory decision-making, the district court set a minimum interest rate. We see no error in its doing so.

### V.  CONCLUSION

The growers are not entitled to challenge the decision in *NAACP II,* and they have established no legal error in the district court's award of backpay to the workers for the 1983 and 1985 harvests. The judgment of the district court is therefore in all respects.

*Affirmed.*